16 N.J. Super. 189 (1951)
84 A.2d 463
EDWARD ZAKLUKIEWICZ. PETITIONER-RESPONDENT, AND CROSS-APPELLANT,
v.
WESTERN ELECTRIC COMPANY, RESPONDENT-APPELLANT, AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 22, 1951.
Decided November 7, 1951.
*191 Before Judges McGEEHAN, JAYNE and WM. J. BRENNAN, JR.
Mr. Samuel H. Nelson argued the cause for respondent (Mr. Irving J. Rosenberg, attorney).
Mr. Arthur F. Mead argued the cause for appellant (Messrs. Cox & Walburg, attorneys).
The opinion of the court was delivered by WILLIAM J. BRENNAN, JR., J.A.D.
The Hudson County Court reversed the dismissal in the Workmen's Compensation Division of petitioner's claim petition and entered judgment for him upon an award of 30 per cent partial permanent disability. The question for decision upon respondent's appeal is whether the county court properly found that petitioner had sustained the burden of establishing a causal connection between the accident and his migratory thrombophlebitis.
The claim petition was filed October 10, 1949. Petitioner sought to establish that the disease was started by an accident which occurred over 9 1/2 years before on June 24, 1940, when he struck his left knee against an iron support on his work bench, fainted and fell off his chair. He was taken to the plant hospital and given first aid by Dr. Lowell, a plant *192 physician. Dr. Lowell caused a first aid record to be made at the time which states that petitioner had bruised his left knee and also had "a brush burn on anterior surface middle tibia (third of left leg) swelling of left upper lip, no laceration." The next morning petitioner reported to Dr. Lowell. The note of that examination recites, "brush burn of left leg healed  no dressing necessary. Condition of left knee better, condition of employee is better, no treatment necessary."
Petitioner saw Dr. Lowell again on August 13, 1940, seven weeks after the accident. Meanwhile he had been absent from the plant, for illness from June 28 to July 8 and again from July 10 to July 20, and on vacation after July 30. On August 13 a swelling and redness was present in his lower left leg. Dr. Lowell diagnosed the condition as "condition seems to be a phlebitis," but was of the opinion, and reported, that it was not causally connected with the accident because, he testified, the symptoms had not appeared within the time when they could have been expected if the accident had been the producing cause of the disease. His opinion was that the symptoms would have been manifest in less than a week, that generally they appear within 24 hours. Thereafter respondent treated petitioner's case as a sickness rather than an accident case and over the ensuing ten-year period supplied medical treatment and hospitalization as privileges to which petitioner is entitled under its sickness benefit plan. In addition to treatments by plant doctors respondent supplied surgery at a Newark hospital in March, 1941, when a ligation (that is, a tying off) of the saphenous vein in the left leg was performed, and hospitalization at New York Post Graduate Hospital in 1942, 1945 and 1950 for diagnoses and treatment under the supervision of Dr. Bobb, a specialist in peripheral vascular diseases, who also treated him many other times as an outpatient. Lesions appeared in his right leg after the ligation was performed, and in after years variously in his left forearm, again in his left leg, in his fingers and in one heel. All the doctors who testified were in accord that his disease was migratory thrombophlebitis.
*193 The disease is a rare and unusual one. It is a specific form of venous pathology markedly different in its characteristics from the more common disease of the veins called thrombophlebitis. The latter is a process of inflammation or irritation of the vein in which all coats of the vein are involved, but particularly the inner lining, or intima. With the involvement of the intima, thrombosis or clotting takes place within the vein, which tends to block the blood flow to the vein, destroy valves and alter the entire structure of the vein. Migratory thrombophlebitis, on the other hand, is an involvement of the middle and outer coats of the vein, with the lining or intima rarely involved so that the vein is still capable in most instances of carrying blood. The characteristic peculiar to migratory thrombophlebitis is that its lesions will arise in veins in different parts of the body independently of one another in point of time and even with long periods of quiescence between lesions; there is no connection physiologically by extension or contiguity between the lesions.
The doctors on both sides agreed that medical science has not yet determined either the cause of the disease or how it takes hold within the body. Dr. Olcott, a pathologist, testifying for respondent, presented the theory that some central source of toxin production in the body shoots off the harmful toxin intermittently and haphazardly, which explains the appearance of its lesions in different veins at different times.
The doctors also agreed that the disease often, indeed most usually, appears unassociated with trauma. Two of respondent's witnesses, Dr. Bobb and Dr. Duryee, another specialist in peripheral vascular diseases, testified that practically all cases in their experience arose spontaneously and that traumatic injury was rarely, if ever, related to it. Dr. Olcott's opinion was that trauma upon a vein could not possibly cause the lesion at the site of the blow "because the vein that might be struck is not the source of the toxin, it is the recipient of it."
The proofs necessary to sustain a finding of causal connection must be such as to warrant the inference that the *194 causal relation between the accident and the disease is a probable or a more probable hypothesis, with reference to the possibility of other hypotheses. Hercules Powder Co. v. Nieratko, 113 N.J.L. 195, 203 (Sup. Ct. 1934). The deputy director's opinion analyzes the proofs and states findings "that the injury sustained by petitioner as the result of the accident on June 24, 1940, at best, was only a slight abrasion of the lower left leg, which cleared up in a few days," that "the greater weight of the medical testimony is borne by the respondent's medical experts," and that "the only possible connection the accident might bear to the said disease is merely a temporal one, namely that the condition of thrombophlebitis migrans developed approximately six weeks after the trivial injury to the lower left leg"; and, based thereon, the conclusion that "I feel reasonably satisfied that the petitioner has failed to sustain the burden of proof in establishing causal relation between the accident and his present condition  thrombophlebitis migrans."
These findings were not, of course, controlling upon the county court. That court was obliged to make an original determination of the factual issues raised by the points involved in the county court appeal and in arriving at its independent determination was required only to give due regard to the deputy director's findings thereon and to his opportunity to judge of the credibility of the witnesses. Folsom v. Magna Manufacturing Co., 14 N.J. Super. 363 (App. Div. 1951).
The reasons supporting the award stated by the county court in its opinion are: (1) that respondent attributed the disease to some cause unrelated to the accident and failed to establish by competent evidence what that cause was, citing Marshall v. C.F. Mueller Co., 135 N.J.L. 75 (Sup. Ct. 1946), and (2) that causal connection was established by proofs that this serious impairment in a man previously in good health had developed and progressed rapidly after the accident, relying on Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54 (App. Div. 1950), certif. den. 5 N.J. 177 *195 (1950), Kolesnik v. Irvington Varnish & Insulator Co., 120 N.J.L. 8 (Sup. Ct. 1938), and Auten v. Johnston, 115 N.J.L. 71 (Sup. Ct. 1935).
The first proposition is not supported in the evidence. The respondent did not claim that some identifiable cause unrelated to the accident had produced the disease, but that the cause could not be determined. The second proposition is supportable only if the proofs warrant an inference that, as stated in the Schust case, the condition "so closely followed an event competent to produce that effect" that "it is difficult * * * to escape the inference of a causal connection between the two." The County Court judgment implies an ultimate conclusion favorable to petitioner upon the questions both of the closeness of the relation between the accident and the onset of the disease and that he suffered an injury which was competent to produce it. However, the evidence as to both questions is in sharp conflict and the County Court made no express findings, as it was required to do, as to how it reached its determination on either question.
In this circumstance we would ordinarily remand with direction to the County Court to make new and amended findings of the essential facts. Cf. Gagliano v. Botany Worsted Mills, 13 N.J. Super. 1 (App. Div. 1951); Folsom v. Magna Manufacturing Co., supra. Since, however, our review of this record satisfies us that a remand would put the parties to needless expense and delay, we will determine the questions by exercise of our power under Rule 3:81-13 to make independent findings.
The essential fact questions are what injury petitioner suffered to his lower leg, and, if only of the trivial character found by the deputy director, whether the symptoms of the disease developed at a time close enough as to justify an inference of a causal relation.
One of petitioner's two medical witnesses as to causal connection was Dr. D'Alessandro, a specialist in peripheral vascular surgery. His opinion was that there could be a causal connection where a trauma is accompanied by infection *196 because, he said, the disease can be a resultant product of an infection. The hypothetical question asked him included a premise that petitioner's left leg had been cut just above the ankle when he fell from the chair and that the "cut on the left leg became red and swollen and infected." That premise was based on petitioner's testimony that as he fell off the chair he struck his leg "against one of the supports there and cut my leg just above the ankle," that Dr. Lowell "put iodine over my cut and a little bandage" and that he saw "a little redness" about the cut "the second day" after which grew in size later.
Dr. Lowell, however, denied that this was the case, said he remembered the incident and that there was no laceration in any part of the lower leg but "a superficial brush burn only," "no dressing" and "no infection" nor signs of any at any examination he made of petitioner.
The testimony was given ten years after the event. If it was all the evidence on the subject greater credence might reasonably be given petitioner's story even after that long lapse because he might be expected to have a more vivid recollection of his injury.
However, in addition to Dr. Lowell's testimony there was other evidence which weighs heavily against petitioner's story. He said that a few days after June 24 his leg pained him "So bad I stopped over Dr. Cooperman's in Newark and went to his office and showed him my leg. He told me to go home and soak my leg with Epsom Salts." A certificate from Dr. Cooperman, which he submitted to respondent at its request at that time, was produced by one of respondent's supervisors, subpoenaed by petitioner to give evidence in support of petitioner's claim. It showed that petitioner consulted Dr. Cooperman for an alleged head injury. Petitioner's attorney asked the witness:
"Q. What does that certificate say? A. It says the man was first examined on 6/27/40, and his sickness began on 6/24/40, and a diagnosis stated is `Under observation' and the nature of his injury is stated as injury to the head.
*197 The Deputy Director: What is that?
The Witness: `Injury to the head. Place of injury at a factory. Prognosis is stated as good. And he said the man probably would not be able to return to work until 7/8/40.'"
Further the contents of respondent's first aid record was also in evidence, likewise adduced as part of petitioner's case through the supervisor. The first aid record corroborates Dr. Lowell. The petitioner does not suggest that the record was not prepared simultaneously with Dr. Lowell's examinations or that it was falsified. As the record is made before respondent is claimed to have had knowledge of the appearance of any symptoms of the disease, the entry "no laceration" is significant.
This analysis of the testimony brings us to the conclusion that the injury sustained by petitioner to the lower part of his left leg was at best only a slight abrasion which cleared up overnight and that he did not suffer, as he testified, a cut and resulting infection.
Thus, in determining the facts, we must disregard Dr. D'Alessandro's opinion as being rested upon an asserted fact which was not established. And we find no merit in petitioner's contention that because respondent's attorney failed to object to the question respondent is estopped to contend that the doctor's opinion should be disregarded. The value of the answer to a hypothetical question asked of an expert witness must be based solely upon the established truth of the facts premised in the question and if any essential component is not found to be as stated, the answer is of no value and cannot be considered at all by the trier of facts. 2 Wigmore, Evidence (1940), pp. 792 et seq.; 58 Am. Jur., Witnesses, p. 487.
The other medical witness was Dr. Applebaum, a specialist in internal medicine. He did not think a cut or break in the skin was a necessary concomitant of a trauma capable of being the inciting factor to start the disease. His opinion was that a trauma, even though rather insignificant and evidenced, as we have found here only by a brush burn without *198 a break in the skin "may" incite the clinical syndrome of the disease. But he said, "there usually are symptoms within twenty-four hours, and objective manifestation may not occur anywhere from a few days to a couple of weeks."
Dr. Applebaum's testimony plainly does not have the quality of evidence from which may be made the inference of a causal connection between a trauma the manifestations of which cleared up within 24 hours and the disease the symptoms of which did not appear in the general area until seven weeks later. The most favorable statement that Dr. Applebaum could make was that the symptoms might occur within "a few days to a couple of weeks." The case is clearly distinguishable from the facts which appeared in Schust v. Wright Aeronautical Corp., supra. In that case the proof that the multiple sclerosis was dormant prior to the accident, that the debilitating effects of the trauma immediately followed petitioner's fall, and that the condition progressively deteriorated, together with medical proof that the trauma could aggravate or precipitate dormant multiple sclerosis, was held to justify the inference of a causal connection between the fall and the condition.
We find that the evidence falls short of establishing cause and effect between the accident of June 24, 1940, and petitioner's migratory thrombophlebitis, and the judgment is accordingly
Reversed. No costs.