STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. THOMAS F. BERTONE, DEFENDANT-APPELLANT.

Argued September 25, 1962—Decided March 4, 1963.

358

*Mr. H. Curlis Meanor* argued the cause for defendant-appellant (*Mr. Meanor,* of counsel; *Mr. Vigdor D. Bernstein,* on the brief).

*Mr. William A. O'Brien,* Assistant Prosecutor of Hudson County, argued the cause for plaintiff-respondent (*Mr. Lawrence A. Whipple,* Prosecutor of Hudson County, attorney).

The opinion of the court was delivered by

SCHETTINO, J. Defendant Bertone appeals as of right (*R. R.* 1:2–1(c)) from a judgment based on a verdict of murder in the first degree with a recommendation of life imprisonment. That defendant, on November 7, 1957, at about 8:30 A. M., killed his "common-law wife" by stabbing her approximately twenty-two times with a knife on the fire escape outside the windows of their furnished apartment in West New York is not in dispute. There were eyewitnesses to the killing. Bertone sought an acquittal by reason of insanity.

Defendant's personal history is important to the defense raised. His mother died in 1934 when he was seven or eight, and his father and sister Margaret took care of him, the latter until she married in 1947. His sister testified that, while under her care, Bertone was "very withdrawn and very unsociable." Defendant left school before he completed the 10th grade and worked at different jobs until 1944, when he was drafted into the Army Air Force. Upon discharge in 1947, he re-enlisted, and in November of that year, he was married. One child was born of this marriage. While in service he attained the rank of sergeant but was broken for going A. W. O. L. just before being honorably discharged in 1950.

On August 4, 1950 Bertone was committed to the Hudson County Hospital for Mental Diseases by his wife. The certificate of insanity accompanying Mrs. Bertone's request, signed by a physician who examined defendant on August 3, showed that Bertone suspected his wife of infidelity and labored under delusions connected therewith. The doctor certified that defendant was violent, dangerous and mentally depressed, and that Bertone stated to him that he would kill his wife. Doctor Reznikoff, Clinical Director of the Hudson County Hospital, concluded at that time that defendant was

suffering from schizophrenic reaction, paranoid type. Nevertheless a member or members of his family obtained his release on August 18, 1950, against medical advice.

On January 31, 1951 Bertone was examined by Doctor Zitani, a specialist in the field of neurology and psychiatry, who was of the opinion that defendant was a paranoid schizophrenic and recommended to his relatives that he be recommitted. In March he was readmitted to the Hudson County Hospital. Hospital records show that his condition was unchanged from that of his prior stay and that he expressed ideas of infidelity connected with his wife to the staff physicians. In October 1951 he was paroled, his condition evidently in a state of remission, although Doctor Zitani later that month found that Bertone was still suffering from delusions and hallucinations. However, the doctor testified that even in a state of remission, the patient still harbors suspicions.

Soon after his release from the hospital, Bertone separated from his wife. About six months later, defendant met the decedent, then sixteen years of age. They kept company until April 1954 when defendant went to Iran to live with a brother and to look for a job. Unable to secure any work, he returned to the United States the end of that year and resumed his relationship with decedent. When decedent became pregnant in 1955, they represented to her father that they had gone to Maryland and had been married. Thereafter, they lived together as man and wife. The first of two children of this relationship was born in October.

Between his return from Iran and October 1957, defendant held several jobs. From October 1955 to May 1956 he worked with his "father-in-law" in Totowa. In September 1957 the couple left the children with her parents and went to Denver, evidently with the thought of residing there, but they returned within three days of their departure. In early October 1957 they rented a furnished room in West New York. On October 18 defendant re-enlisted in the Army and was sent to Fort Dix.

After Bertone left for service, decedent was supposed to move back with her parents. On November 1, 1957 Bertone received a week-end pass and visited her mother. When he did not find decedent there, he went to their room and, according to a letter written by him on November 4 to her father, found another man there under the bed, whom he was unable to catch after a chase. On November 3 he returned to Fort Dix.

On November 4 decedent helped Bertone's sister Margaret move to Clifton. The next day, both women went to Fort Dix to consult with defendant's superior officer and two Army psychiatrists. They returned to Clifton and decedent spent the night with Margaret.

That same day, November 5, Bertone went A. W. O. L. Some time between noon and 1 P. M. he purchased the knife with which he subsequently killed decedent. When he could not locate her, he went to their furnished room and slept there alone that night. Defendant picked up decedent at work the afternoon of November 6, and they spent the night before the killing in their room.

In January 1958 counsel were appointed for defendant. Doctor Reznikoff and Doctor Collins, Clinical Director of the New Jersey State Hospital at Greystone Park, were appointed by the court to examine defendant. As a result of an examination on January 21, 1958, both concluded that he was suffering from schizophrenic reaction, paranoid type. At that time, Bertone complained that his paramour had been unfaithful to him. He also said he heard voices while in the army and in jail which accused him of perversion. As a result of this examination, he was committed to the New Jersey State Hospital in Trenton.

Bertone was returned to the Hudson County jail in December 1959. Doctor Zigarelli, consultant at Greystone Park, examined defendant on March 12, 1960, and although he was of the opinion that defendant still had a schizophrenic personality underneath his behavior pattern, the psychotic process was in remission, and Bertone was found fit to stand trial.

That summer a jury was unable to reach a verdict on the issue of legal insanity at the time of the killing. A trial on all the issues, which resulted in the verdict from which defendant appeals, began on September 26, 1960.

Defendant raises two points on this appeal: (1) that the verdict of the jury finding defendant sane at the time of the homicide was against the weight of the evidence, and (2) that the trial judge, in his charge, committed prejudicial error by withdrawing from the jury the issue of the relative weight to be accorded lay and psychiatric testimony.

## I.

Defendant bottoms his attack on the jury verdict on the ground that, in answer to a hypothetical question posed by the prosecutor, the opinions of both of the State's psychiatrists —that on November 7, 1957, defendant could distinguish between right and wrong and knew the nature and quality of his act—were predicated upon the assumption that when the defendant reacted violently to the supposed infidelity of decedent, he was reacting, in fact, to reality and not to a myth created by his own delusional state. More specifically, in a letter written by defendant to decedent's father on November 4 and received by him after his daughter's death, defendant wrote that he suspected the decedent of being untrue to him, although he could not prove it; that when he came home on November 1 on a week-end pass he found a man under the bed but was unable to catch him; and that decedent had to pay for everything she did to him. In the hypothetical questions, the prosecutor asked the State's psychiatric witnesses to assume, in addition to the facts of defendant's life history up to the time of the killing, that "he came home unsuspectedly one night and heard a man in his apartment. His wife let him in. A man came from under the bed and left. He chased the man, he described him." Defense counsel urges that if the State's hypothesis had set forth that the alleged infidelity of decedent was a product of

the mental condition of the defendant without any basis in fact, these psychiatrists would then have said that defendant could not comprehend the difference between right and wrong and did not appreciate the nature and quality of his acts on the morning of the homicide. Thus the bedrock foundation for this psychiatric opinion is alleged to have depended upon whether or not decedent had, in fact, been unfaithful to him.

The hypothetical question combines facts and circumstances, assumed to be true, into an understandable and specific situation upon which the expert witness is asked to give an opinion. The facts incorporated therein, however, must be supported by evidence in the case, whether it be direct testimony or rational inferences deducible therefrom. *Beam v. Kent,* 3 *N. J.* 210, 215 (1949). That the supporting evidence may be in conflict is immaterial; each side is entitled to put its version of the situation to the witness for his opinion. *Ollert v. Ziebell,* 96 *N. J. L.* 210, 213 (*E. & A.* 1921); *Peer v. City of Newark,* 71 *N. J. Super.* 12, 21 (*App. Div.* 1961), certif. denied 36 *N. J.* 300 (1962). The safeguard is that on cross-examination opposing counsel can reframe the hypothetical or ask the expert whether his opinion would change if one or more of the material facts assumed conformed to the cross-examiner's version of what the true facts are. McCormick, *Evidence* § 14, at *p.* 32 (1954).

Where the hypothetical is used and the supporting evidence is in conflict, the opinion expressed in reply to the question will have value only insofar as the facts assumed are so found by the jury. If all material facts assumed are found to be established, the opinion is well-based, although the jury is not conclusively bound thereby; if any essential component is not found to be as stated, the opinion is without foundation and the jury must disregard it. *Zaklukiewicz v. Western Electric Co.,* 16 *N. J. Super.* 189, 197 (*App. Div.* 1951).

In this case, five psychiatrists were called to testify; three by the defense and two by the prosecution in rebuttal. All agreed defendant was a schizophrenic with a paranoid

trend. Characteristic of this affliction, defendant had delusions and hallucinations, but in his case they were always related to spouse infidelity or personal sex perversion. Likewise, all agreed that defendant could not be cured, but that if his condition were in a state of remission, he could lead a relatively normal life. In such a state, a person can appreciate the nature and quality of his acts and distinguish between right and wrong. Bertone's condition was in a state of remission after his release from the mental institution in 1951. When he was examined in January 1958, his condition was once again active. There was testimony that in a delusional state, a person may still be able to satisfy the right-wrong test, but usually he cannot. Thus a critical question for the jury was whether his condition became active before, during or after the killing.

We find from the testimony that whether Bertone did in fact see a man under the bed or whether his assertion was the product of a sick mind was an essential component of the hypothetical, the answer to which had a direct bearing on the approximate time the state of remission ceased. Defense counsel read to Doctor Zitani, appearing for the defense, portions of Bertone's letter to decedent's father to get his opinion whether it indicated to him in any way that defendant's condition was no longer in a state of remission. He replied, "A. I could not answer that. I would not make any answer to that. I don't know if there was a man there or if this man was deluding and hallucinating." Doctor Reznikoff, also appearing for the defense, was asked on cross-examination whether, from the letter, he would say Bertone was delusional. The doctor in return asked if other witnesses saw the man under the bed, and the prosecutor replied that the only other person there was dead. "A. Then, I can't say anything. Considering this man, I would say this is delusional, but if somebody else saw that, I would believe. Q. * * * You would believe that whatever he says is delusional, unless he can prove it? A. Whatever he says pertaining to his extremely pathological delusions of jealousy. He may be all

right on every other subject, but when it comes to that point, his mind is irrational."

In rebuttal, the State called Doctors Zigarelli and Collins and put to each of them the hypothetical here in question. Based on the hypothetical, Doctor Zigarelli testified that in his opinion Bertone, on November 7, 1957, could premeditate and deliberate, that he knew the nature and quality of his act, and that he could distinguish right from wrong. Then the prosecutor asked:

"Q. Psychotic people, from whatever type of disease they suffer, can they deliberate and premeditate? A. They can, unless the premeditation and deliberation involve their psychotic or abnormal thinking process.

Q. In other words, *if* there was in reality a man in Bertone's wife's life, and *if* there was a man in his girl friend's life, and he reacted as I told you he did, could he distinguish between right and wrong under those circumstances? A. At the time he could, *if* he were reacting to a reality situation, he could." (Emphasis added.)

On cross, Doctor Zigarelli emphasized that, while his testimony in June 1960 did not fix the time Bertone's condition became active more precisely than the latter part of 1957, his answer in this trial was based upon the hypothetical ("I answered that specific hypothetical question"). Doctor Collins, in response to the hypothetical, also testified that Bertone was legally sane on November 7, and on cross-examination explicitly stated that he based his answer on the history he received from the prosecutor, treating the facts therein as true. Defense counsel did not ask either of the rebuttal witnesses what his opinion would be if Bertone was delusional the night he visited decedent.

The foregoing summary of psychiatric testimony relative to the hypothetical indicates the importance of the assumed fact. We find that the letter was sufficient evidence to support the prosecution's version of the facts. The contrary—that Bertone's assertion in the letter was the product of a delusion—is likewise supportable by a rational inference deducible from the fact that he is a schizophrenic, paranoid type, an inference drawn by Doctor Reznikoff in testimony

quoted above. Thus, it was for the jury to make a finding and to credit or discredit the answers to the hypothetical accordingly. Morcover, as we read the testimony, the jury was made well aware of the fact that there was this conflict in evidence and that Doctors Zigarelli and Collins predicated their answers on the prosecutor's version of the disputed fact.

Furthermore, all this psychiatric testimony was not considered in the abstract; there was the lay testimony of those who knew Bertone or saw him the day of the killing. His sister said he was withdrawn and not sociable and was of the opinion that he was not normal. Decedent's father, on the other hand, testified that he appeared normal all the time he knew Bertone. He and another of Bertone's co-workers, who also testified, commuted to work by car with the defendant during the latter's eight-month employment in Totowa in 1955–1956. They stated that defendant usually talked about his hobbies—photography and fishing—or about the television programs he had seen the night before. They described his work-day actions and his lunch-time contacts with fellow workers as not unusual.

[6] Defendant's landlady had dealings and conversations with him within a few weeks prior to the killing and found him soft-spoken and very mannerly. She saw him on the fire escape immediately after the slaying and asked him to come in. He obeyed and stood quietly by as she scolded him for causing a disturbance, and then he asked her to call the police. The policeman who saw defendant after the killing testified that his actions were normal. In giving two statements to the police later that day, only one of which he signed, defendant answered all questions intelligently and expressed sorrow to decedent's father at the police headquarters. Finally, the jury had defendant's letter to his "father-in-law," received after the killing but written on November 4, three days before the killing, which was clearly and lucidly written, although accusatory.

While there was ample psychiatric testimony that when the condition of one so afflicted as Bertone is in an active

state he will appear normal in all respects except with regard to the subject of his delusion or hallucination, there was sufficient evidence to make defendant's sanity a question of fact, and we cannot say that the jury verdict was against the weight of that evidence. And although defendant's condition was in an active state two months after the slaying, it is entirely possible, a possibility acknowledged by two of the psychiatric witnesses, that he became insane subsequent thereto as a result of brooding over what he had done. Apparently, the jury thought so.

## II.

We next consider defendant's charge that the trial court failed to instruct the jury properly on the relative weight to be accorded lay and psychiatric testimony. Defendant submitted the following "Request to Charge":

"In weighing opinions given by both lay persons and doctors, you have the right to decide what weight or credence you shall give to such opinions, and you may either accept or reject any such evidence."

The trial court refused so to charge but instructed the jury as follows:

"Expert testimony bearing upon the sanity of the defendant has been adduced in this case, and such testimony is relevant and admissible. However, as with all evidence, it is subject to the test of credibility in light of attendant facts, and it is in *parity* with lay opinion, which has also been introduced, in that the Jury is entitled to give to each —the expert and the lay—*equal weight*. Nonetheless, expert testimony has a strong bearing and must not be arbitrarily disregarded. The opinions of psychiatrists constitute evidence to be considered and weighed by the Jury, together with other evidence, but are not binding on it." (Emphasis supplied by defendant.)

Defendant complains that this charge had the effect of depriving the defendant of his right to have the jury and not the trial court assess the weight to be given to the conflicting evidence on the question of his sanity.

The jury is the sole judge of the weight to be given to lay and psychiatric testimony. 9 *Wigmore, Evidence* §

2551, at *p.* 503 (*3d ed.* 1940). Generally speaking, no distinction is made between expert testimony and evidence of another character. See 86 *A. L. R. 2d* 1038 (1962). The same tests that are applied in evaluating lay testimony must be used in judging the weight and sufficiency of expert testimony. The jury must consider the ability of the witness, his knowledge, his opportunity for study or observation of the matters about which he testifies, the possible bias in favor of the side for whom he testifies, and all other matters which serve to illuminate his statements.

■ When we consider the propriety and effect of the instruction here challenged relating to the weight to be accorded medical expert testimony based on hypotheticals and lay testimony based on personal observation, we must bear in mind that a trial court cannot state the law of the case in a single sentence; the charge must be read as a whole in light of a sensible construction to determine its legal worth. And although a certain sentence taken alone may need some amplification to render it wholly accurate, yet if such amplification is given in the context so that the jury cannot be misled, there is no error justifying reversal. *State v. Tansimore,* 3 *N. J.* 516, 525 (1949).

This is precisely the situation here. By speaking of expert testimony as being "in parity with lay opinion," entitling the jury "to give to each * * * equal weight," the trial judge adopted the language of *State v. Scelfo,* 58 *N. J. Super.* 472, 477–478 (*App. Div.* 1959), certif. denied, 31 *N. J.* 555 (1960). Defendant claims *Scelfo* was an unwarranted departure from the rule that the jury be the sole judge of the weight of testimony. *Scelfo* states nothing more than that expert witnesses are to be treated the same as any other witness in testimonial matters. But its language, as incorporated in the charge before us, might have created in the minds of the jurors a doubt as to whether expert and lay testimony had to be given equal weight or whether both were to be evaluated in the same manner.

A reading of the portion of the charge quoted earlier, coupled with the succeeding paragraphs, demonstrates that the charge was clarified so that the jury could not have been misled. The trial judge set out the function of a psychiatrist who testifies ("to inform the jury of the character of his [defendant's] mental disease"), but cautioned the jury that in determining mental capacity, it was entitled to consider the conduct of the accused as it appeared to lay observers at the time of the crime. He then discussed the extent to which the jury could consider evidence of other attacks of insanity, emphasizing that it must determine whether defendant could distinguish between right and wrong at the time he stabbed decedent. Observing that there was a conflict in medical testimony and that the jury would have to determine where the truth rests, the trial judge went on to say: "You are the judges of the credibility of medical witnesses as well as all the other witnesses, and the weight to be attached to their testimony." After instructing the jury on what it must do upon resolving the issue of defendant's sanity and the voluntariness of his signed statement and after instructing them on reasonable doubt, the trial court returned to its earlier theme:

"You had an opportunity to observe the witnesses and their demeanor while testifying. You have a right to consider the interest of each and every witness who took the stand \* \* \*. You must weigh the credibility of each and every witness and determine for yourselves what weight, if any, you will give to his or her testimony. You must come to your own honest conscientious conclusion with respect to the weight of the evidence as it impressed you.

\* \* \* \* \* \* \* \*

The basic task before you in this case is to resolve where the truth really is, and you can resolve that truth by resolving the degree of credibility or reliability in the witnesses who have been produced before you. You are to determine the factual situation by carefully analyzing and scrutinizing the testimony of each and every witness with a view of determining whether a witness is neutral or friendly, or whether the witness told the truth or colored or exaggerated the testimony. You may in your sound judgment or discretion accept all the testimony of a witness as true, or reject it as untrue, or credit it

in part as true or discredit it in part as untrue. You are to do justice, and justice aims to ascertain the truth."

Our examination of defendant's request in light of the whole charge convinces us that there was no error. The instructions left the question of the weight to be given to all types of testimony ultimately in the hands of the jury. The trial court charged the substance of the request, although not in its exact language. Defendant is not entitled to have the charge in words of his own choosing, as long as the charge as a whole clearly and correctly states the pertinent principles of law. *Balls v. Joseph Newman, Inc.,* 3 *N. J.* 503, 510–511 (1950).

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—6.

*For reversal*—None.