THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. RALPH DAVIS, DEFENDANT-APPELLANT.

Argued April 24, 1967—Decided July 5, 1967.

*Mr. C. Douglas Reina* argued the cause for appellant (*Mr. Norman J. Abrams,* attorney).

*Mr. Raymond S. Londa,* Assistant County Prosecutor, argued the cause for respondent (*Mr. Leo Kaplowitz,* Union County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Ralph Davis was convicted of murder in the first degree and sentenced to die. We reversed the judgment because there had been comment upon his failure to testify, in terms forbidden by the opinion handed down thereafter in *Griffin v. State of California,* 380 *U. S.* 609, 85 *S. Ct.* 1229, 14 *L. Ed. 2d* 106 (1965). *State v. Davis,* 45 *N. J.* 195 (1965). The retrial resulted again in the imposition of the death sentence. Defendant appeals directly to us pursuant to *R. R.* 1:2–1(c).

The State tried the case upon the thesis that the killing occurred during a robbery. On January 25, 1963 the deceased, Leon Hanjian, a rug merchant, was murdered at his store on Morris Avenue, Elizabeth, New Jersey. The essential facts in the State's case were undisputed, and at this juncture we need only summarize them. Seven witnesses placed defendant at or in the general area of the store at a time consistent with guilt. The unusual deformity of defendant's right leg apparently attracted attention to him. When apprehended less than two hours after the shooting, he had on his person the wallet of the deceased and the gun which, according to the State's proof, fired the fatal shot. There was human blood at the cuff of his trousers, on his jacket, and on his coat. The bloodstain on the trousers, the only one that could be typed, was found to be of type O, and although the blood of both defendant and deceased was of that type, there was no break in defendant's skin to suggest the blood was his. On the way to police headquarters after his apprehension, defendant volunteered to the detectives that the

driver of the car in which he was captured "didn't have anything to do with it."

The defense introduced evidence of defendant's general background. It produced expert testimony that no opinion could be reached either way upon the question whether the gun was the fatal weapon. It proved that the gun was bought by Edward Warren Bernard, a friend of defendant. Bernard, originally held as a material witness, could not be located for the trial. Defendant's sister testified that defendant lived with her in Linden, and that on the day of the crime Bernard and defendant left her apartment together sometime between noon and 1 P. M. This time estimate was not inconsistent with defendant's guilt, and there was no evidence placing Bernard near the scene of the crime. Defendant did not testify.

I

After the reversal of the first conviction, defendant for the first time moved to suppress the articles taken from him at the time of his arrest. His motion was denied. He challenges that ruling.

The facts are these: At about 12:50 P. M. a lady next door to the store heard a "loud banging sound," which probably was the report of the fatal shot. At 1:25 P. M. a customer entered the store and found the deceased on the floor, unconscious. A bullet had passed through his head, the point of entry being above the right ear. The customer telephoned the police, who responded at once. At 1:32 P. M. Officer McGuire, directed by his superior to canvass the neighborhood for information, interviewed Miss Hivick, who lived directly across the street from the Hanjian store, and learned from her that at 12:52 P. M. she saw a man coming down the walk leading from the Hanjian store entrance to the public sidewalk. He had his right hand in his coat pocket. He had a pronounced limp. She gave the officer a description which he immediately relayed to Elizabeth police headquarters. In turn, the Elizabeth police asked the State Police at Newark

to issue a teletype alarm. The teletype message went out at 2:13 P. M. to some 200 local police headquarters, including those of Roselle and Linden. It read:

"Wanted for Murder. Colored man, age unknown, 6 feet 1 inch, slim build, good looking, walks with a limp. Black, ¾ length coat, raincoat; black fedora hat, black pants, white scarf. Owner of drug[1] store was found shot this city — occurred 13.27 date — has since expired."

The Roselle police department relayed this message by radio, and its officers, Dixon and Pogue, riding in their patrol car, agreed at once that the description matched defendant. Upon receiving the report, Deputy Chief Radecki of that department immediately ordered defendant picked up for questioning for this murder, for Radecki had seen defendant the day before and recalled that defendant's garb was that described in the teletype alarm. Radecki, Dixon and Pogue knew defendant had recently been released from State Prison. Upon receipt of Radecki's order, Dixon and Pogue began to patrol areas frequented by defendant.

At 2:45 P. M. Dixon and Pogue spotted defendant in a car driven by Al Myers at the intersection of Paul Street and St. George's Avenue. Dixon stopped the Myers car, and since it was in Linden just over the Roselle line, he asked Myers to move the car across the street. Myers declined. Dixon told defendant that Radecki wanted him for questioning, to which defendant answered that "If Radecki wants me, tell him to come to my house for me." Dixon replied that he would book defendant in Linden, and sent a call for aid.

Detective Laukaitis of Roselle arrived quickly and told defendant he was under arrest for murder on the strength of the teletype message. Detectives Eichhorn and Novalany of the Linden police department came shortly thereafter. Eichhorn also told defendant he was under arrest for murder. Defendant was ordered to leave the car with his hands down,

---

[1] It should have read "rug."

and as he did so he either lunged at Laukaitis or fell toward him because of his severely crippled leg. Laukaitis reacted by raising his hands to push defendant away, and as his hands contacted defendant's chest he felt a hard object he recognized as a gun. With the help of another officer, Laukaitis removed the weapon, and as he did, a knife fell to the ground. The gun later proved to be the murder weapon according to the State's ballistic proof. Defendant was immediately taken to the Linden police headquarters where a search of his person yielded the wallet of the deceased and the blood-stained clothing mentioned above.

Thus by 2:45 P. M., within about 1¼ hours after the dying victim was found, the defendant was in custody, still in possession of the gun and the wallet which nailed down his guilt of murder. This was excellent police work, but defendant says the Constitution condemns it. Specifically, he says that since there was no search warrant, the search and seizure can be sustained only as an incident of a lawful arrest, and the arrest, defendant says, was not lawful because there was no probable cause for it.

The trial judge denied the motion to suppress on several grounds. He held first that probable cause existed for the arrest. Next he held that if an arrest for murder was unwarranted, nonetheless there were exceptional circumstances justifying detention for investigation, and the search was incident thereto. Finally he held that if neither the arrest nor the detention was valid, still the seizure resulted from a non-searching observation which came about when defendant lunged or fell into Detective Laukaitis causing the officer to raise his hands defensively and to perceive by touch the existence of the weapon, the possession of which would itself justify an arrest and the further search of the person which followed. We are satisfied the first ground, i. e., that probable cause existed for the arrest, is amply sustained by the facts and hence we need not consider the alternative grounds given by the trial judge.

■■ The Fourth Amendment does not bar all searches and seizures. It bars only those that are "unreasonable." The concepts developed in this area remain subordinate to that ultimate standard. The question, then, is whether what was done must be said on the total factual complex to be "unreasonable." *State v. Doyle,* 42 *N. J.* 334, 343–344 (1964) ; *State v. Romeo,* 43 *N. J.* 188, 206 (1964), *cert.* denied, 379 *U. S.* 970, 85 *S. Ct.* 6685, 13 *L. Ed. 2d* 563 (1965) ; *State v. Fioravanti,* 46 *N. J.* 109, 122–123 (1965), *cert.* denied, 384 *U. S.* 919, 86 *S. Ct.* 1365, 16 *L. Ed. 2d* 440 (1966) ; *State v. Mark,* 46 *N. J.* 262, 278–279 (1966). Each case must turn on its own facts. *Ker v. State of California,* 374 *U. S.* 23, 33, 83 *S. Ct.* 1623, 10 *L. Ed. 2d* 726, 737 (1963) ; *State v. Contursi,* 44 *N. J.* 422, 430 (1965).

Since the Fourth Amendment speaks, not in terms that are absolute, but rather of unreasonableness, it necessarily calls for a continuing reconciliation of competing values. Pre-eminent in the galaxy of values is the right of the individual to live free from criminal attack in his home, his work, and the streets. Government is established to that end, as the preamble to the Constitution of the United States reveals and our State Constitution, Art. I, ¶ 2, expressly says. We want the citizen to forego arms on the strength of that assurance. If the Fourth Amendment is read to frustrate effective law enforcement, government will fail in its primary mission, its promise that the individual shall be secure from attack upon his person and his things.

It is well to remember that the proposition before us is that evidence which undeniably establishes guilt of murder shall be suppressed, not because its probative worth was tainted in the least by the manner in which it was obtained, nor because the Fourth Amendment says it shall be suppressed, but rather because the judiciary, believing it was unable to fashion a remedy for a breach of the Fourth, settled upon the sanction of suppression to induce obedience to its command. *Elkins v. United States,* 364 *U. S.* 206, 217, 80 *S. Ct.* 1437, 4 *L. Ed. 2d* 1669, 1677 (1960) ; *State v.*

*Smith,* 37 *N. J.* 481, 486 (1962), *cert.* denied, 374 *U. S.* 835, 83 *S. Ct.* 1879, 10 *L. Ed. 2d* 1055 (1963).[2] We should be mindful that while the judge-made sanction supports the right of the individual to be free from wrongful invasion by the State, it tends to deny him protection from grievous invasion by the criminal. For unless we can assume that offenders set free by suppression of patent proof of their guilt will not resume a criminal course, we must recognize that the pain of the sanction of suppression will be felt, not by some abstraction called the "police" or "society," but by tomorrow's victims, by the innocent who more likely than not will be the poor, the most exposed and the least protected among us. Nor can we fail to note that while the sanction supports the high value inherent in freedom from unwarranted search, yet in another aspect it works against public morality because the suppression of the truth must tend to breed contempt for the long arm of the law. Such are the stakes, and it is in their light that the unreasonableness of a search must be measured.

The subsidiary concept, "probable cause," defies precise definition. It is something less than proof needed to convict and something more than a raw, unsupported suspicion. It is a suspicion (or belief[3]) of guilt that is "well

---

[2] It remains obscure whether the States, in fashioning "workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States," *Ker v. State of California, supra,* 374 *U. S.,* at *p.* 34, 83 *S. Ct.,* at *p.* 1630, 10 *L. Ed. 2d,* at *p.* 738, may withhold the sanction of suppression in marginal situations. For present purposes we assume there is no leeway.

[3] The word "suspicion" or "suspect" is commonly used in the definition of probable cause. See 4 *Blackstone, Commentaries* *292; 5 *Am. Jur. 2d, Arrest* § 44, *p.* 735; *Jackson v. Knowlton,* 173 *Mass.* 94, 53 *N. E.* 134, 135 *(Sup. Jud. Ct.* 1899). In other settings "suspicion" may rest upon nothing more than imagination, but as to probable cause, suspicion must arise out of reasonable grounds in the facts and circumstances, and hence it either equals or results in a "belief" of guilt. In this context "suspect" and "believe" are substantial equivalents. *De Salvatore v. State,* 2 *Storey* 550, 52 *Del.* 550, 163 *A. 2d* 244, 249 *(Sup. Ct.* 1960).

grounded." *State v. Burnett,* 42 *N. J.* 377, 387 (1964); *State v. Contursi,* 44 *N. J.* 422, 429–430 (1965). The emphasis is upon a practical, realistic view of law enforcement, in recognition of the primacy of the individual's right to be safe from attack.

Thus *Beck v. State of Ohio,* 379 *U. S.* 89, 91, 85 *S. Ct.* 223, 13 *L. Ed.* 2d 142, 145 (1964), repeats from *Brinegar v. United States,* 338 *U. S.* 160, 176, 69 *S. Ct.* 1302, 93 *L. Ed.* 1879, 1891 (1949), that the rule of probable cause is "a practical, nontechnical conception" designed to afford "the best compromise that has been found for accommodating * * * often opposing interests," and that

"* * * Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

*Beck* adds from *Ker v. State of California, supra,* 374 *U. S.* 23, 83 *S. Ct.* 1623, 10 *L. Ed.* 2d 726, that the States may develop "workable rules" to meet "the practical demands of effective criminal investigation and law enforcement," within the limits of the Constitution. (379 *U. S.,* at *p.* 92, 85 *S. Ct.,* at *p.* 226, 13 *L. Ed.* 2d, at *p.* 145.)

With this guidance, we turn to the totality of the facts known to the police upon which the teletype alarm issued and the arresting officers acted. *State v. Fioravanti, supra,* 46 *N. J.,* at *p.* 122. There was a known criminal event. It was of major proportions—a man was murdered at his place of business. So far as was then known, there was no witness to the shooting or trace left by the murderer at the scene. An observant neighbor described in amazing detail a man she saw coming from the store with his hand in the right coat pocket, at a time consistent with his complicity in the shooting. Three police officers who knew defendant immediately concluded the description fitted him. One of them had seen defendant the day before and recalled his dress matched the teletyped description. All of the officers knew defendant had recently been released from State Prison.

■ Defendant says there were gaps in the picture: first, because no one could know that the person seen coming from the store was the felon, and second, because no one could be sure the person Miss Hivick described was the defendant. The criticism is not substantial, for, as we have said, probable cause does not require proof sufficient to convict. It suffices if the facts, considered not severally but in their totality, generate a well-grounded suspicion that defendant was the slayer. The precise description, its rather unique content suggesting the defendant, the fact that he was seen coming from a store in which the commodity, rugs, would not draw a heavy flow of customers, plus his known criminal record, see *State v. Burnett, supra,* 42 *N. J.,* at *p.* 387, pointed to him as the probable slayer. The facts known to the police were ample to persuade a reasonable mind that defendant should be deemed a suspect in terms of fair probabilities.

Surely, to recur to *Brinegar,* it cannot be said the officers acted only on "whim or caprice." Rather, to require more than they had "would unduly hamper law enforcement," for it was vital that the murderer be apprehended at once in the hope that he would still have on him tangible proof of his guilt. Without such evidence, a crime of a hit-and-run character may go unsolved. In terms of "the practical demands of effective criminal investigation and law enforcement" to which *Ker* and *Beck* refer, there is no promising alternative to the immediate apprehension of a likely suspect. There is no magic in law enforcement. As we said earlier, the police work in this case was outstanding. We are satisfied the Fourth Amendment did not stand in the way.

## II

The thesis of the prosecution being that the homicide was committed in the course of a robbery, proof of that felony was essential to the State's case. Defendant says that there was no evidence at all from which the fact of robbery could be inferred.

Nothing was taken from the store itself. A safe, closed but unlocked, was not disturbed. That this is so does not demonstrate the murderer was not prompted by a purpose to rob. The safe could not be seen from the point at which the body was found, and in any event its appearance did not suggest it was unlocked. Moreover, once the gun was fired, the slayer likely decided to leave in a hurry. As to the victim himself, his clothing was described as unrumpled. The sum of $3.75 was found in his right trouser pocket. There was, however, no wallet on his person. A wallet, incontestably his, was found on defendant. In it was, among other things, the deceased's driver's license, and he had driven the truck to the store that day. But there was no one who saw the wallet in the deceased's possession on that day, and the son of the deceased could say only that he last saw it some ten days before. It is the absence of proof of the deceased's possession of the wallet at the time of the killing upon which defendant rests his claim that there was no evidence of robbery.

█ █ We are referred to *State v. Dancyger*, 29 *N. J.* 76 (1959), *cert.* denied, 360 *U. S.* 903, 79 *S. Ct.* 1286, 3 *L. Ed.* 2*d* 1255 (1959), in which we stated the familiar rule that the unexplained possession of stolen property shortly after a theft justifies an inference that the possessor is the thief. The case before us does not turn upon a reading of *Dancyger*. The question here is simply whether proof of defendant's possession of the wallet within two hours after he killed the deceased permits an inference that defendant obtained the wallet at the time of the killing. We think the inference is more than permissible; it is inescapable. To avoid the natural thrust of that proof one would have to assume a remarkable coincidence, that is, that defendant obtained the wallet on another occasion in some unknown fashion and then visited the deceased at the store for some unknown purpose and killed him for some unknown reason. To put it another way, defendant argues his proposition as if the only evidence against him is the proof of his possession of the wallet. We

need not say whether that proof alone would suffice for there is also other evidence that he killed the deceased. There is the gun, the testimony that put him at the entrance to the store, the blood, and his exculpation of Myers. It is in that factual setting that there must be weighed the fact that two hours after the homicide defendant had in his possession an article so personal to the deceased as his wallet. We do not see how anyone could resist the inference that the killing and defendant's possession of the wallet were related by robbery.

## III

The trial court charged the jury that the verdict must be murder in the first degree (with or without a recommendation of life imprisonment) or acquittal. Defendant says the court should have permitted a verdict of murder in the second degree. Thus whereas the trial court charged that there must be an acquittal if the State did not prove the killing occurred in the course of a robbery, defendant says the jury should have been told that in that eventuality his guilt, if he were found to be the slayer, would be in the second degree.

We said in *State v. Mathis*, 47 *N. J.* 455, 466–467 (1966) :

"Here there was no evidence affirmatively suggesting the killing was other than in the course of an attempt to rob. Still the question remains whether the State's proof as to an attempt to rob was so unequivocal as to make it idle to ask the jury to pass upon it. * * *

A defendant who denies complicity does not thereby concede the criminal event was everything the State claims it was. It remains the burden of the State to satisfy the jury beyond a reasonable doubt that the murder was of the character the statute denounces as murder in the first degree. If under the proof there is in fact no room for dispute as to whether the killing occurred in the perpetration or attempt to perpetrate the felony, our cases say the issue should not be left to the jury. *State v. Zeller*, 77 *N. J. L.* 619 (*E. & A.* 1909) ; *State v. Ciampietro*, 107 *N. J. L.* 120, 122 (*E. & A.* 1930) ; *State v. Pacheco*, 38 *N. J.* 120, 131 (1962). The cases elsewhere hold that if, on the trial of a first-degree charge, it 'appears clearly' from the evidence that the homicide was of no lower degree, the trial court 'may,' and some cases say 'should,' instruct the jury to find the defendant guilty of murder

in the first degree or not guilty. 41 *C. J. S. Homicide* § 392, *p.* 209. To leave the issue of second-degree murder with the jury in such circumstances could conceivably lead to a compromise verdict. On the other hand, if the issue of second-degree murder is improperly taken from the jury, the jury might convict of first-degree or acquit a man whose guilt is of a lesser degree."

Here there was no tenable explanation of the homicide in terms other than a killing in the course of a holdup. The murder occurred at a place of business where the deceased merchandised rugs. His wallet was in defendant's possession within two hours of the shooting. It would be sheer speculation to say, if defendant was the slayer, that the wallet came into his hands in some unconnected way. Nothing in the state of the record suggested that possibility. Hence the trial court concluded it would be idle to ask the jury to consider whether the killing occurred other than in the course of a robbery. We think the ruling was correct.

### IV

On direct examination Officer Dixon testified:

"Q. Now, while transporting the defendant to Linden Police Headquarters, was there any conversation that you heard in the vehicle in the presence of the defendant? A. Yes, there was.

Q. Would you tell us what that conversation was?

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A. Yes, Ralph, Mr. Davis, stated that Myers didn't have anything to do with it. Also, Detective Eichhorn said something about 'You really hit a home run' or 'reached home plate' or some baseball term. I don't know. Like I said before, I don't know what it was. And that's about the drift of it.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Q. Officer Dixon, was the remark by Detective Eichhorn made before the remark by the defendant Davis? A. I don't recall, really."

Detective Eichhorn was unavailable at the trial. Defendant says that at the first trial Dixon said Eichhorn's comment preceded Davis' statement. Either way, we see no basis for reversal.

■ Defendant argues that the admission of his statement was tantamount to drawing an inference from his silence, citing *State v. Ripa,* 45 *N. J.* 199 (1965). Defendant was not silent. He volunteered to protect Myers, and in so doing he inferentially indicated his own involvement.

As to Eichhorn's comment, if it preceded Davis' statement, it was admissible, in the discretion of the trial court, since it tended to identify the event to which defendant's statement referred. If Eichhorn's comment followed the remark by Davis, it was inadmissible. However, we see no harm. It was already apparent that the officers thought there was a basis for defendant's arrest for this murder. Eichhorn's remark implied no more. In the circumstances it could not have suggested to the jury that he knew something the jury did not have before it. Nor did the comment loom significantly in the case. Dixon was not cross-examined upon it. Neither the defense nor the State mentioned it in summation, and the trial court mentioned it without emphasis only in the course of a detailed resumé of all the testimony. The error, if there was one, could not conceivably have influenced the result.

We have reviewed the entire record, and there being no basis for reversal, the judgment is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For reversal* — None.