STATE OF NEW JERSEY IN THE INTEREST OF A.J., JUVENILE–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 22, 1989—Decided April 19, 1989.

Before Judges MICHELS, MUIR, Jr., and KEEFE.

*Salem Vincent Ahto* argued the cause for appellant (*Taigman & Ahto,* attorneys; *Albert B. Jeffers,* of counsel and on the brief).

*Joseph P. Connor, Jr.,* Assistant Morris County Prosecutor, argued the cause for respondent State of New Jersey (*Lee S. Trumbull,* Morris County Prosecutor, attorney; *Joseph P. Connor,* of counsel and on the brief).

*Cherrie Madden Black,* Deputy Attorney General, argued the cause for *amicus curiae Peter N. Perretti,* Jr., Attorney

General of New Jersey (*Peter N. Perretti*, attorney; *Cherrie Madden Black*, of counsel and on the brief).

The opinion of the court was delivered by

MICHELS, P.J.A.D.

Pursuant to leave granted by this court, A.J., a juvenile (hereinafter referred to as the "Juvenile"), appeals from an order of the Chancery Division, Family Part, that waived jurisdiction over him and transferred the matter to the Law Division, Criminal Part, pursuant to *N.J.S.A.* 2A:4A–26 of the New Jersey Code of Juvenile Justice and *R.* 5:22–2.

The record shows that on Saturday, September 5, 1987, T.K. and S.G., both 16–year old females, were working at a clothing store in Morristown. As the end of the work day neared, the girls discussed their plans for the evening. S.G. said that her mother and her mother's boyfriend would be out of town for the evening and that T.K. and the Juvenile, a 17–year old male, should come to her house if they were able to obtain drugs. She told T.K. that she wanted to try "angel dust" (phencyclidine) or heroin, and that with only her grandparents in the house and her own boyfriend out of town, the three would have the house to themselves.

The girls repeatedly telephoned the Juvenile who was living with his parents in Morristown. When the Juvenile did not answer the phone, the girls walked the short distance to his house where they found him asleep. They woke the Juvenile and the trio walked back to the clothing store where S.G.'s grandparents were waiting to drive S.G. home. As S.G. was leaving with her grandparents, she told T.K. to call when the plans were set for the evening. While T.K. and the Juvenile walked back to the Juvenile's house, they discussed the possibility of purchasing drugs. When they arrived at the house, the Juvenile went inside to get his leather jacket and returned to tell T.K. that they were "going on a run." T.K. and the

Juvenile had gone on "runs" in the past and T.K. knew that this meant going into New York City to purchase "angel dust."

T.K. and the Juvenile walked to the Morristown train station where T.K. telephoned S.G., informing her of the plans for the evening. When S.G. arrived at the station, both girls gave all of their money, which totalled approximately $65, to the Juvenile so he could "make the exchange" for the drugs. As a precaution, the Juvenile put $30 into his sock so the trio would have money to get home "just in case anything happened." At approximately 7:30 p.m., the trio boarded the train to Hoboken. From Hoboken, they took a PATH train to New York City and then the subway to "Spanish Harlem." Their destination was the area of 125th Street and Lenox Avenue where they intended to purchase the drugs.

Once they arrived in the proper area, the trio, led by the Juvenile, approached a man to see if he had any "dust" for sale. The man stated that he had only one bag of angel dust. After the Juvenile informed the man that he wanted more than one bag, the man went into a building to obtain additional bags of angel dust. At this time the Juvenile purchased two bags. Thereafter, the trio and a girl who they had just met walked around the corner to another building where the Juvenile went inside by himself and purchased two additional bags of angel dust.

After the second purchase, the group of four walked to a local park where they intended to use the drugs. As the Juvenile began to prepare an angel dust laced marijuana cigarette, using "rolling papers" that he had purchased earlier, T.K. warned him that she saw "two cops coming." The Juvenile dropped the marijuana cigarette and hid the remaining drugs down the back of T.K.'s skirt. As soon as the police walked away, the trio separated from their acquaintance, retraced their steps and arrived back in Morristown at approximately 11:30 p.m.

Upon arriving in Morristown, the trio went to the Dunkin Donuts located in the shopping mall near the train station. After a short while, they left the Dunkin Donuts and headed for the train tracks behind the mall where they intended to "smoke the dust." As they sat behind an "unused train car" that had been parked "off the main rails," the Juvenile prepared an angel dust laced marijuana cigarette that was smoked and shared by the group. Thereafter, a second marijuana cigarette, similarly laced with angel dust, was shared by the group.

After the second cigarette, the trio started walking down the tracks toward an area in Morristown known as "The Hollow." As time passed, T.K. reminded the Juvenile that he had a midnight curfew and suggested that they turn around and walk toward his house. It was at this time that T.K. saw S.G. lying on the train tracks, between the two rails. The Juvenile and T.K. attempted to move S.G. from the tracks, but were unsuccessful because they were both "fairly messed up" from smoking the angel dust. S.G. felt like a "dead weight" in their arms. The Juvenile tried to carry S.G. by himself, but this attempt was similarly unsuccessful. T.K. testified that S.G. did not attempt to remove herself from the tracks. "[I]t was like [S.G.] didn't know what in the world was going on," T.K. said.

When the Juvenile's further efforts to remove S.G. from the tracks were to no avail, T.K. picked up S.G.'s purse and a poster that had been taken from the PATH train and placed these items on the ground next to S.G. Apparently S.G. had dropped these items a short distance from where she was lying on the tracks. At this time, the Juvenile suggested that they leave S.G. where she was. As the Juvenile and T.K. walked towards the Juvenile's house, T.K. saw S.G. lying on the tracks, propping herself up with her arm, and "running her hands across the rocks that were between the ties." This was the last time the two saw S.G.

When they arrived at the Juvenile's house, the pair went immediately into the Juvenile's room. While in the room, they heard the sound of police sirens off in the distance and this led T.K. to believe that S.G. might have been hit by a train. A short while later, the Juvenile's mother entered the room and told T.K. that she would drive her home.

At approximately 12:30 a.m. on September 6, 1987, a New Jersey Transit train traveling west from Morristown struck and killed S.G. The train's engineer saw S.G. on the tracks and applied the train's emergency brake but was unable to stop the train in time. He stated that S.G. was sitting between the tracks and did not attempt to move or even turn her head as the train approached. Although S.G.'s cause of death was initially listed as suicide, a subsequent toxicology report indicated that S.G.'s blood and urine contained 0.15 mg/L of phencyclidine. On the basis of this report, the cause of death was changed to accident.

When T.K. arrived home, she told her sister about the events of the evening, including the drug use, and asked her sister to drive her to pick up S.G. because she feared that S.G. would be hit by a train. T.K. was still visibly under the influence of the angel dust at this time. Noticing this, T.K.'s sister did not believe what she had been told. T.K. then went to her room to telephone the Juvenile. While she was on the telephone she received a call, on her "call waiting," from the Morristown Police. In response to questions regarding S.G.'s whereabouts, T.K. informed the police that she had last seen S.G. at approximately 8:00 p.m. that evening. She stated that she, S.G. and the Juvenile had been "uptown" and that S.G. had just "walked away." After warning her sister not to tell the police "anything," T.K. "clicked over to the other [telephone] line" and continued her conversation with the Juvenile. She told the Juvenile what the police had asked her. In response, the Juvenile stated that they could be "in trouble" and that they should "be ready for this."

After a short time, T.K. received a call from S.G.'s sister. In response to the girl's questions about S.G.'s whereabouts, T.K. stated that she didn't know "anything." Thereafter, T.K. continued her conversation with the Juvenile, only to be interrupted a short time later by a second call from S.G.'s sister. T.K. repeated that she didn't know where S.G. was, and clicked back over to the Juvenile who ended the conversation by saying that he was going to smoke the remaining angel dust.

Early the next morning, T.K. received a call from S.G.'s mother. T.K. repeated that she didn't know where S.G. was. Finally, S.G.'s mother informed T.K. that S.G. had been killed by a train. Shortly thereafter, T.K. and the Juvenile spoke on the phone and agreed that they would speak to the police and claim that S.G. had purchased the drugs.

On the afternoon of September 6, 1987, the Juvenile contacted the Morristown Police and stated that he wanted to talk "about the accident on the train tracks." A Morristown police officer was dispatched to the Juvenile's house and listened to the Juvenile's story. The next day the Juvenile made a formal statement at the Morristown Police Station. In both statements, the Juvenile claimed that he, T.K. and S.G. had gone to New York City to shop for a leather coat for T.K. He stated that S.G. left while he and T.K. shopped, and that when S.G. returned she was under the influence of drugs. The Juvenile further stated that when the trio returned to Morristown, S.G. rolled the angel dust laced marijuana cigarettes and virtually forced him to smoke. Finally, he stated that S.G. was not on the train tracks when he and T.K. last saw her. T.K. made a similar formal statement on September 8, 1987, but later recanted this statement at the waiver hearing.

Complaints were filed in the Chancery Division, Family Part, charging the Juvenile with (1) possession of a controlled dangerous substance, to wit, phencyclidine, in violation of *N.J.S.A.*

2C:35–10a;[1] (2) possession of phencyclidine with intent to distribute, in violation of *N.J.S.A.* 2C:35–5a(1); (3) distribution of phencyclidine, in violation of *N.J.S.A.* 2C:35–5a(1), and (4) causing a drug-induced death, in violation of *N.J.S.A.* 2C:35–9. The State moved, pursuant to *N.J.S.A.* 2A:4A–26 and *R.* 5:22–2, for an order waiving the jurisdiction of the Chancery Division, Family Part, and transferring the matter to the Law Division, Criminal Part, for adult prosecution. Following a waiver hearing, Judge MacKenzie in the Chancery Division, Family Part, found that there was probable cause to believe that (1) the Juvenile had "distributed" the phencyclidine or "angel dust" to S.G., and (2) the Juvenile's act of distribution was the cause of S.G.'s death. Consequently, the trial court found that the State had met its burden, under *N.J.S.A.* 2A:4A–26, of establishing that (1) the Juvenile was over the age of 14 at the time of the alleged delinquent act, and (2) there was probable cause to believe that the Juvenile had committed a delinquent act which if committed by an adult would constitute strict liability for drug-induced deaths pursuant to *N.J.S.A.* 2C:35–9. Thereafter, the trial court found that the Juvenile had not met his burden of showing the probability of his rehabilitation prior to attaining the age of 19. Accordingly, the trial court granted the State's motion and waived the jurisdiction of the Chancery Division, Family Part. The trial court stayed the proceeding, however, pending disposition of the Juvenile's motion for leave to appeal to this court. We granted the motion and accelerated the appeal.

The Juvenile seeks a reversal of the order waiving jurisdiction and a dismissal of the complaints filed against him or, alternatively, a reversal of the order and a remand to the

---

[1]Although *N.J.S.A.* 24:21–7d(7) indicates that phencyclidine is a Schedule III Controlled Dangerous Substance, pursuant to authority granted by *N.J.S.A.* 24:21–3, the State Commissioner of Health has rescheduled phencyclidine from Schedule III to Schedule II. *See N.J.A.C.* 8:65–10.2(b)(4).

Chancery Division, Family Part, for further proceedings. The
Juvenile raises the following issues in his brief:

I. In finding probable cause, the court below erred by failing to deal in its
findings of fact that [sic]: (1) there was a probability that the death of S.G.
was caused by suicide in that the investigating authorities first so concluded
and they failed to make further investigation of that probability, and (2) there
was a probability that her death was not caused by her inhalation of
phencyclidine and that death did not ensue as a direct impact of the drug on
her physiological system but, rather, by the negligent operation of the train
under the control of its engineer.

II. Having found probable cause, in considering the issue of waiver, the court
below erred in failing to apply the balancing standards mandated by the
Supreme Court of New Jersey and by substituting its own opinion for the
unequivocal and unrefuted expert testimony presented on behalf of defendant
with respect to probability of rehabilitation.

III. An examination of the legislative history of *N.J.S.A.* 2C:35-9 demon-
strates that it was the intent of the legislature thereby to facilitate the
apprehension, conviction and enhanced punishment for drug-induced deaths
of drug "kingpins"—the upper echelon of members of sophisticated drug
trafficking networks whose activities result in the sale of drugs manufac-
tured by illicit new techniques through sophisticated drug merchants, and
therefore the court below erred in applying the statute to the actions of
defendant.

IV. *N.J.S.A.* 2C:35-9 is unconstitutional in that it: (1) violates the due process
and equal protection requirements of the Fourteenth Amendment of the
United States Constitution *(U.S. Const. Amend. XIV)* and the New Jersey
Constitution *(N.J. Const. Art. I., Par. I.);* (2) is overbroad and vague; (3)
shifts the burden of proof to the defendant; and (4) in any event the
application of the statute to the facts of this case is unconstitutional.

V. It is unfair to a juvenile defendant and against public policy to subject him
to adult prosecution in a test case of the application of new legislation in the
context of applying it to a set of facts which go beyond the plain meaning of
the text of the statute.

## I.

*The finding of probable cause to believe that the Juvenile
committed a delinquent act which if committed by an
adult would constitute strict liability for drug-induced
deaths pursuant to N.J.S.A. 2C:35-9.*

 The Juvenile contends that the trial court erred in find-
ing probable cause to believe that his acts resulted in the
drug-induced death of S.G. Specifically, the Juvenile argues

that (1) the State did not establish, by way of a hypothetical question, a "link" between S.G.'s ingestion of the phencyclidine and her death, and (2) the trial court erred in failing to find that S.G.'s death was a suicide or the result of the train engineer's negligence.

*N.J.S.A.* 2A:4A-26, the waiver provision of the Code of Juvenile Justice, in pertinent part, reads:

a. On motion of the prosecutor, the court shall, without the consent of the juvenile, waive jurisdiction over a case and refer that case from the family court to the appropriate court and prosecuting authority having jurisdiction if it finds, after hearing, that:

(1) *The juvenile was 14 years of age or older at the time of the charged delinquent act;* and

(2) *There is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute:*

(a) Criminal homicide other than death by auto, *strict liability for drug induced deaths, pursuant to N.J.S. 2C:35-9,* robbery which would constitute a crime of the first degree, aggravated sexual assault, sexual assault, aggravated assault which would constitute a crime of the second degree, kidnapping or aggravated arson....

\* \* \* \* \* \* \* \*

(3) Except with respect to any of the acts enumerated in subsection a.(2)(a) of this section, or with respect to any acts enumerated in subparagraph (e) of paragraph (2) of subsection a. of this section which involve the distribution for pecuniary gain of any controlled dangerous substance or controlled substance analog while on any property used for school purposes which is owned by any school or school board, or within 1,000 feet of any school property or while on any school bus, or any attempt or conspiracy to commit any of those acts, the State has shown that the nature and circumstances of the charge or the prior record of the juvenile are sufficiently serious that the interests of the public require waiver.

*However, if in any case the juvenile can show that the probability of his rehabilitation by the use of the procedures, services and facilities available to the court prior to the juvenile reaching the age of 19 substantially outweighs the reasons for waiver, waiver shall not be granted.* [Emphasis added].

Thus, to meet its burden under *N.J.S.A.* 2A:4A-26, the State had to establish that (1) the Juvenile was 14 years of age or older at the time of the charged delinquent act, and (2) there was probable cause to believe that he committed a delinquent act which if committed by an adult would constitute strict

liability for drug-induced deaths pursuant to *N.J.S.A.* 2C:35–9. *N.J.S.A.* 2A:4A–26a(1), –26a(2)(a).[2] Once this had been established, the Juvenile had the burden of establishing (1) the probability of his being rehabilitated prior to attaining the age of 19, and (2) that this probability substantially outweighed the reasons for waiver. *N.J.S.A.* 2A:4A–26a(3).

*N.J.S.A.* 2C:35–9, which is part of the Comprehensive Drug Reform Act of 1987, *N.J.S.A.* 2C:35–1 *et seq.*,[3] in pertinent part, provides:

> a. Any person who manufactures, distributes or dispenses methamphetamine, lysergic acid diethylamide, *phencyclidine* or any other controlled dangerous substance classified in Schedules I or II, or any controlled substance analog thereof, *in violation of subsection a. of N.J.S. 2C:35–5*, is strictly liable for a death which results from the injection, inhalation or ingestion of that substance, and is guilty of a crime of the first degree.
>
> b. The provisions of N.J.S. 2C:2–3 (governing the causal relationship between conduct and result) shall not apply in a prosecution under this section. *For purposes of this offense, the defendant's act of manufacturing, distributing or dispensing a substance is the cause of a death when:*
>
> (1) The injection, inhalation or ingestion of the substance is an antecedent but for which the death would not have occurred; and
>
> (2) The death was not:
>
> (a) too remote in its occurrence as to have a just bearing on the defendant's liability; or
>
> (b) too dependent upon conduct of another person which was unrelated to the injection, inhalation or ingestion of the substance or its effect as to have a just bearing on the defendant's liability.
>
> c. It shall not be a defense to a prosecution under this section that the decedent contributed to his own death by his purposeful, knowing, reckless or negligent injection, inhalation or ingestion of the substance, or by his consenting to the administration of the substance by another. [Emphasis added].

---

[2]It should be noted that *L.*1987, *c.* 106, which served to enact *N.J.S.A.* 2C:35–1 *et seq.*, also amended *N.J.S.A.* 2A:4A–26a(2)(a) to expressly provide for waiver of a juvenile who is believed to have violated *N.J.S.A.* 2C:35–9. *L.*1987, *c.* 106, § 23.

[3]Legislative materials indicate that the statute is entitled the Comprehensive Drug Reform Act of 1986, but *N.J.S.A.* 2C:35–1 indicates that the statute may be cited as the Comprehensive Drug Reform Act of 1987. In any event, the act was operative as of July 9, 1987, pursuant to *L.*1987, *c.* 106, § 1.

*N.J.S.A.* 2C:35–5, the underlying offense in *N.J.S.A.* 2C:35–9, in pertinent part, provides:

a. Except as authorized by P.L.1970, c. 226 (C.24:21–1 et seq.), it shall be unlawful for any person *knowingly or purposely:*

(1) To manufacture, distribute or dispense, or to possess or have under his control with intent to manufacture, distribute or dispense, a controlled dangerous substance or controlled substance analog.... [Emphasis added].

The following definitions, as set forth in *N.J.S.A.* 2C:35–2, are necessary for a proper interpretation of *N.J.S.A.* 2C:35–5 and *N.J.S.A.* 2C:35–9:

"Administer" means the direct application of a controlled dangerous substance or controlled substance analog, whether by injection, inhalation, ingestion, or any other means, to the body of a patient or research subject by: (1) a practitioner (or, in his presence, by his lawfully authorized agent), or (2) the patient or research subject at the lawful direction and in the presence of the practitioner.

"Agent" means an authorized person who acts on behalf of or at the direction of a manufacturer, distributor, or dispenser but does not include a common or contract carrier, public warehouseman, or employee thereof.

\* \* \* \* \* \* \* \*

"Deliver" or "delivery" means the actual, constructive, or attempted transfer from one person to another of a controlled dangerous substance or controlled substance analog, *whether or not there is an agency relationship.*

"Dispense" means to deliver a controlled dangerous substance or controlled substance analog to an ultimate user or research subject by or pursuant to the lawful order of a practitioner, including the prescribing, administering, packaging, labeling, or compounding necessary to prepare the substance for that delivery. "Dispenser" means a practitioner who dispenses.

*"Distribute" means to deliver other than by administering or dispensing a controlled dangerous substance or controlled substance analog. "Distributor" means a person who distributes.* [Emphasis added].

Thus, to establish a violation of *N.J.S.A.* 2C:35–9, the State had to establish that (1) the Juvenile knowingly or purposely distributed phencyclidine to S.G.; (2) S.G. died, and (3) the Juvenile's act of distributing the phencyclidine to S.G. was the cause of S.G.'s death. As set forth in *N.J.S.A.* 2C:35–9b, the Juvenile's act of distributing the phencyclidine was the cause of S.G.'s death if (1) the injection, inhalation or ingestion of the phencyclidine was an antecedent but for which the death of S.G. would not have occurred, and (2) the death of S.G. was not too remote to have a just bearing on the Juvenile's liability or too

dependent upon the conduct of another person that was unrelated to the use or effects of the drug.

Probable cause exists when there is a well founded suspicion or belief of guilt. Although the suspicion of guilt must be something more than a raw, unsupported suspicion, it may be something less than the proof needed to convict. *See State v. Davis,* 50 *N.J.* 16, 23–24 (1967), *cert.* den. 389 *U.S.* 1054, 88 *S.Ct.* 805, 19 *L.Ed.*2d 852 (1968); *State v. Contursi,* 44 *N.J.* 422, 429–430 (1965); *State v. Burnett,* 42 *N.J.* 377, 386 (1964). Probable cause need not equal the *prima facie* case required to sustain a conviction, *State v. De Simone,* 60 *N.J.* 319, 322 (1972), and need not be based solely on evidence admissible in the courtroom. *State v. Fariello,* 71 *N.J.* 552, 569 (1976). Stated simply, "[n]o more is demanded than a well-grounded suspicion or belief that an offense [has taken] place and the individual [was] party to it." *State v. De Simone, supra,* 60 *N.J.* at 322. *See State v. Sims,* 75 *N.J.* 337, 347–348 (1978); *State v. Davis, supra,* 50 *N.J.* at 23–24; *State v. Burnett, supra,* 42 *N.J.* at 386–388; *State v. Bates,* 202 *N.J.Super.* 416, 422–423 (App.Div.1985); *State in Interest of A.A.M.,* 228 *N.J. Super.* 9, 12–13 (Ch.Div.1988).

In finding that there was probable cause to believe that the Juvenile knowingly or purposely distributed phencyclidine to S.G., the trial court stated:

In that respect, a reasonable tryor [sic] of fact, whether it be a juvenile Court Judge or impaneled jury, could determine that with respect to these elements of probable cause and the statute which has been implicated in the complaint that A.J., knowingly and intentionally, purchased a substance which he knew or had reason to believe was—well, I will use the abbreviation because it's easier for the record, PCP, was aware of its character and quality, it was a conscious and intentional and willful decision on his part to make the purchase. It was based upon a prior practice of such purchases in New York City which A.J. had been able to establish that A.J. having purchased the substance from two different on-the-street distributors, then participated directly and intentionally and knowingly in a process of using the PCP as part of an illicit-type cigarette by rolling it, including the PCP with other materials knowing exactly what he was doing.

And in so doing, facilitated the use of the PCP by the juveniles—by the juvenile whose initials are S.G. He knew the purpose for preparing the PCP-laced illicit cigarette, was mainly to use and to share with others including

S.G., each of whom also was aware as to what the substance was and A.J., at the time he prepared and shared with the others, the cigarette with the PCP, was aware from prior experience of the character and the quality and the effect of the usage on the human body, including his own.

And with that awareness in mind, he nonetheless made available to S.G. at her request, the illegal cigarette which he had arranged for and facilitated the purchase of, actually exchanging money with the dealer for, used his prior know-how to roll the cigarette and being aware of what he was including in the hand-rolled cigarette and knowing what effect or likely effect it could and would have based on prior experience on another person.

In that sense, it could be, if the testimony and other evidence in support of the State's case is believed, and of course, again, the caveat may be not believable when tested through cross-examination through confrontation with other—what appear to be prior inconsistent statements and other evidence of a physical sort that may very well be inconsistent with the assertions of T.K. and other State witnesses.

But, in any event, for today's hearing purposes, the Court concludes that a reasonable tryor [sic] of fact could determine that as such, A.J. was the facilitator of the distribution to a person with awareness of the consequences that could or likely would occur by that person using the PCP-laced cigarette, knowing that the person wanted to use the cigarette.

These findings and conclusions are amply supported by the record. The Juvenile's act of providing or delivering the phencyclidine to S.G. plainly constituted distribution within the meaning of *N.J.S.A.* 2C:35–2, and the trial court's finding in this regard is consistent with our holding in *State v. Roach,* 222 *N.J.Super.* 122 (App.Div.1987), certif. den. 110 *N.J.* 317 (1988). In *Roach,* we held that the defendant was engaged in the distribution of marijuana, within the meaning of *N.J.S.A.* 24:21–2 of the New Jersey Controlled Dangerous Substance Act, when he and another individual shared in the smoking of a marijuana cigarette by passing the cigarette back and forth. We explained:

The Legislature decreed that "it shall be unlawful for any person knowingly or intentionally [t]o ... distribute ... a controlled dangerous substance," *N.J.S.A.* 24:21–19.a(1), and permitted the imposition of an enhanced term of imprisonment upon "[a]ny person who is at least 18 years of age who violates § 19a(1) by distributing any other controlled dangerous substance ... to a person 17 years of age or younger who is at least three years his junior...." *N.J.S.A.* 24:21–26.b. The term "[d]istribute" is defined in *N.J.S.A.* 24:21–2 as meaning "to deliver other than by administering or dispensing a controlled dangerous substance," and " '[d]istributor' means a person who distributes." Delivery is "the actual, constructive, or attempted transfer from one person to

another of a controlled dangerous substance, whether or not there is an agency relationship." *Id. We discern nothing in this statutory language to suggest that the Legislature intended that distribution of a controlled dangerous substance not include the transfer of marijuana as two individuals passed a "joint" back and forth in sharing the smoking of it.* "Distribute" under the Act clearly and simply means delivery, that is, the "transfer from one person to another of a controlled dangerous substance...." *N.J.S.A.* 24:21–2. *State v. Heitzman,* 209 *N.J.Super.* 617, 621 (App.Div.1986), aff'd, 107 *N.J.* 603 (1987). As the clear and unambiguous language of the statute admits of no other interpretation further exploration to discern legislative intent is unnecessary. *State v. Valentin,* 208 *N.J.Super.* 536, 539 (App.Div.1986), aff'd, 105 *N.J.* 14 · (1987).

As we observed in *State v. Sainz,* 210 *N.J.Super.* 17, 25 (App.Div.1986), aff'd, 107 *N.J.* 283 (1987), *distribution under the Act is present "whether the intent is merely to share cocaine casually with a friend or to control a widespread network of illicit distribution and sale."* *Ibid.* In *Heitzman,* we also noted that distribution does not require a commercial sale but can take place in the sharing of marijuana with social guests. 209 *N.J.Super.* at 620–621. We perceive no valid distinction between the passing of an unlighted or lighted marijuana cigarette from one person to another as would permit the delivery of the unlighted material to be considered distribution of a controlled dangerous substance but not the transfer of a lighted "joint." Moreover, here, even if the substance were furnished by J.B., defendant's position at the JINS Shelter required that upon obtaining possession of the marijuana cigarette it be confiscated. By passing it back to the juvenile and thus permitting further unlawful use of the substance, defendant knowingly and intentionally transferred the marijuana to J.B. Clearly, defendant thereby engaged in distribution of the marijuana within the intendment of the statute. [*Roach, supra,* 222 *N.J.Super.* at 126–128 (Emphasis added)].

In the present case, the trial court further found that there was probable cause to believe that the Juvenile's act of distributing the phencyclidine was the cause of S.G.'s death. In reaching this conclusion, the trial court reasoned:

[I]n any event, with respect to the causation issue, she's dead and the reasonable tryor [sic] of facts with respect to the causation aspect of the statute which is a special—an especially-created element of the burden of proof that the State must meet created by the Legislature, a reasonable tryor [sic] of fact could conclude that the "but for" test has been established. That is to say that the ingestion through smoking of the PCP-laced cigarette had a direct and uninterrupted effect of incapacitating this young lady, S.G., to such an extent, physical coordination and mental faculties were impaired. And that, as a result of this serious and as it turns out tragic impairment of her physical and mental faculties, she was unable to effectively deal with her environment, was unable to recognize a real and immediate risk to her safety.

\* \* \* \* \* \* \* \*

On the other hand, with respect to the "but for" test, there is no sufficient remoteness either in terms of time or place or in cause and effect as to on this record take the State out of its proofs.

\* \* \* \* \* \* \* \*

In other words, it was foreseeable on this record to A.J. that he not only had facilitated the ingestion of the PCP by S.G. as the Court has already noted, but—and having an awareness of the likely effect from his prior experiences of the debilitating and destructive effect that this chemical substance would have upon the bodily function and the mental function of S.G., he left her in a place where he recognized where she was in imminent danger.

So there was a foreseeability and a lack of remoteness in terms of cause and effect since trains do run on tracks that does not take the State out of its proof with respect to let's say the exception to the "but for" test.

The trial court's findings and conclusions in this regard are also amply supported by the record. Without repeating all of the proofs developed at the waiver hearing, we emphasize that T.K.'s testimony indicated that the Juvenile purchased the angel dust, prepared the angel dust laced cigarettes and distributed the cigarettes to S.G. and T.K. T.K. also testified that she and the Juvenile left S.G. lying on the train tracks while S.G. was acting as if "she didn't know what in the world was going on." Similarly, the train's engineer testified that S.G. was sitting between the tracks and did not attempt to move or even turn her head as the train approached. Finally, Dr. Steven Marcus testified that a state of catatonia or coma, in which the person becomes immune to or doesn't interact with her environment, is consistent with the concentration of phencyclidine found in S.G.'s blood and urine. Thus, from a consideration of the proofs and the reasonable inferences that may be drawn therefrom, the trial court reasonably could have found that there was probable cause to believe that the inhalation or ingestion of phencyclidine was an antecedent but for which the death of S.G. would not have occurred, and that S.G.'s death was not too remote to have a bearing upon the Juvenile's liability or too dependent upon the conduct of another that was unrelated to the inhalation or ingestion of the drug or its effect.

Finally, the Juvenile's claim that the trial court erred in failing to find that S.G.'s death was caused by the train engi-

neer's negligence is clearly without merit. The trial court did not find that the engineer was not in any way responsible for S.G.'s death. Rather, the trial court merely stated that the issue of the engineer's liability would have to be determined at trial.

Consequently, we are satisfied that the trial court properly concluded that there was probable cause to believe that the Juvenile knowingly or purposely distributed phencyclidine to S.G. in violation of *N.J.S.A.* 2C:35–5, and that the Juvenile's distribution of the drug to S.G. was the cause of her death within the meaning of *N.J.S.A.* 2C:35–9b.

## II.

*The finding that the Juvenile had not met his burden of showing the probability of his rehabilitation prior to attaining the age of 19.*

■ The Juvenile also contends that the trial court erred in finding that he had not met his burden of establishing the probability of his rehabilitation prior to attaining the age of 19. The Juvenile claims that the trial court failed to follow the proper balancing guidelines, as set forth in *State v. R.G.D.*, 108 *N.J.* 1 (1987), in determining whether the probability of his rehabilitation substantially outweighed the reasons for the waiver.

Once the State had established the factual predicate for the waiver of jurisdiction under *N.J.S.A.* 2A:4A–26, the burden shifted to the Juvenile to establish (1) the probability of his being rehabilitated prior to attaining the age of 19, and (2) that this probability substantially outweighed the reasons for waiver. *N.J.S.A.* 2A:4A–26a(3). *See State v. R.G.D., supra,* 108 *N.J.* at 11; *State In Interest of S.M.,* 211 *N.J.Super.* 675, 681 (App.Div.1986).

Upon this record, we are convinced that the trial court reasonably could have found that the Juvenile did not meet his

burden of establishing the probability of his rehabilitation prior to attaining the age of 19. In concluding that the Juvenile had not met his burden, the trial court was unpersuaded by the Juvenile's two experts, Dr. Philip Witt, a clinical psychologist, and Dr. Daniel Paul Greenfield, a psychiatrist and substance abuse specialist. Dr. Witt, who interviewed the Juvenile on June 9, 1988, and June 13, 1988, testified that he found "no sign[s] of organic impairment or any deterioration in [the Juvenile's] cognitive functioning." Dr. Witt further testified that the Juvenile's "problems [were] primarily drug related," and that the earlier treatments that he had received were unsuccessful or lacking because "they were simply too brief." He acknowledged, however, that the Juvenile was "not the most mature" of adolescents, and he conceded that his own role was merely to transmit his findings to Dr. Greenfield and "not necessarily to reach a final conclusion." With respect to the possibility of the Juvenile's rehabilitation prior to attaining the age of 19, Dr. Witt said, "I'm not really expert enough to offer an opinion as to that."

Dr. Greenfield interviewed the Juvenile on seven occasions and was familiar with the treatment he was receiving at Integrity House, a drug rehabilitation program in Berkeley Heights, New Jersey. Dr. Greenfield testified that the Juvenile's only clinically significant problem was "polysubstance abuse" that was in full remission. He stated that he did not see a propensity for violence in the Juvenile and that the public would be safe from the Juvenile in the future. Finally, Dr. Greenfield was of the opinion that the Juvenile could be rehabilitated prior to attaining the age of 19, if he remained at Integrity House, because the program was very successful and had a low rate of recidivism. On cross-examination, however, Dr. Greenfield admitted that the data on the "success" rate at Integrity House was somewhat suspect.

Although the Juvenile presented expert testimony to show that he could be rehabilitated prior to attaining the age of 19, the trial court was not required to accept that testimony. It is

well settled that a trial court is "not required to give controlling effect to the testimony of the experts." *State in the Interest of C.A.H. & B.A.R.*, 89 *N.J.* 326, 343 (1982). *See State v. Bertone*, 39 *N.J.* 356, 367–370 (1963), *cert.* den. 375 *U.S.* 853, 84 *S.Ct.* 113, 11 *L.Ed.*2d 80 (1963); *State v. Scelfo*, 58 *N.J.Super.* 472, 477–478 (App.Div.1959), certif. den., 31 *N.J.* 555 (1960). "Expert testimony need not be given greater weight than other evidence or than it otherwise deserves in light of common sense and experience." *State in the Interest of C.A.H. & B.A.R.*, *supra*, 89 *N.J.* at 343.

Furthermore, at the time of the waiver hearing, the Juvenile had attained the age of 18 years and approximately three months. For the Juvenile to qualify under the statute, he would have to be rehabilitated by the age of 19 and not merely in the process of becoming rehabilitated.

■ Finally, since the trial court was unconvinced that the Juvenile could be rehabilitated prior to attaining the age of 19, it was not required to undertake the balancing of factors that was described in *State in the Interest of C.A.H. & B.A.R.*, *supra*. The trial court indicated, however, that if it were to engage in such an analysis, the outcome would be the same.

In sum, the trial court's findings and conclusions in support of its determination that the jurisdiction of the Chancery Division, Family Part, should be waived are amply supported by the proofs and we see no sound reason or justification to disturb them. *See State v. R.G.D.*, *supra*, 108 *N.J.* at 15; *State v. Johnson*, 42 *N.J.* 146, 162 (1964). Moreover, under *N.J.S.A.* 2A:4A-26, juveniles charged with the crimes of murder, robbery, sexual assault, strict liability for drug-induced deaths pursuant to *N.J.S.A.* 2C:35-9 and similar serious offenses "are the primary candidates for waiver to the adult courts." *State v. R.G.D.*, *supra*, 108 *N.J.* at 11. The waiver statute creates a "presumption" in favor of waiver. *See State v. R.G.D.*, *supra*, 108 *N.J.* at 12; *State in Interest of A.B.*, 214 *N.J.Super.* 558, 566 (App.Div.1987), aff'd 109 *N.J.* 195 (1988).

All other contentions raised by the Juvenile in *Points* I and II are clearly without merit. *R.* 2:11–3(e)(2).

### III.

*The Juvenile's challenge to the constitutionality and applicability of N.J.S.A. 2C:35–9.*

In *Points* III, IV and V, the Juvenile challenges the constitutionality and applicability of *N.J.S.A.* 2C:35–9. These claims were not presented to or decided by the trial court at the waiver hearing and the present appeal is not an appropriate forum for a determination of these issues. Consequently, we decline to consider them.

It is firmly settled that a court should not reach or determine a constitutional issue unless absolutely imperative in the disposition of the litigation. *See Donadio v. Cunningham,* 58 *N.J.* 309, 325–326 (1971); *Ahto v. Weaver,* 39 *N.J.* 418, 428 (1963); *State v. Fahrer,* 212 *N.J.Super.* 571, 580 (App.Div.1986) (Brody, J., concurring). "Further, an appellate court should not consider an issue, including a constitutional issue, that the parties neither raised nor argued below 'unless it goes to the question of jurisdiction or presents a matter of real public importance.'" *State v. Fahrer, supra,* 212 *N.J.Super.* at 580 (quoting *Deerfield Estates, Inc. v. Tp. of East Brunswick,* 60 *N.J.* 115, 120 (1972)). Such is not the situation here.

The Juvenile's waiver hearing, under *N.J.S.A.* 2A:4A–26, was preliminary in nature and did not involve a determination of his guilt or innocence. *See State v. R.G.D., supra,* 108 *N.J.* at 18; *State v. Lueder,* 74 *N.J.* 62, 77 (1977); *State in Interest of B.T.,* 145 *N.J.Super.* 268, 273 (App.Div.1976), certif. den. 73 *N.J.* 49 (1977). *See also State v. Van Buren,* 29 *N.J.* 548, 554 (1959). Rather, the focus of the hearing was to determine the appropriate court to hear the matter. *See State v. R.G.D., supra,* 108 *N.J.* at 18; *State in Interest of B.T., supra,* 145 *N.J.Super.* at 273. The facts of the present case were developed at the waiver hearing only to the extent necessary to determine the

proper court for the prosecution and determination of the matter. Under these circumstances, it would be inappropriate, at this time, to resolve challenges to the constitutionality and applicability of *N.J.S.A.* 2C:35–9.

Moreover, *R.* 3:10–3 provides the Juvenile with a procedural avenue, should he be indicted by a grand jury, within which to raise his constitutional and other challenges to the statute. *R.* 3:10–3 provides:

> The defense that the indictment or accusation fails to charge an offense and the defense that the charge is based on a statute or regulation promulgated pursuant to statute which is unconstitutional or invalid in whole or in part may only be raised by motion either before trial or within 10 days after a verdict of guilty or within such further time as the court may fix during such 10–day period, or on appeal. Such defenses shall not be considered during trial.

The existence of this procedural remedy renders consideration and determination of the constitutional and other issues raised in *Points* III, IV and V unnecessary.

Accordingly, the order under review is affirmed.