236 N.J. Super. 336 (1989)
565 A.2d 1106
STATE OF NEW JERSEY IN THE INTEREST OF J.L.W., JUVENILE.
Superior Court of New Jersey, Appellate Division.
Submitted September 18, 1989.
Decided October 25, 1989.
*339 Before Judges J.H. COLEMAN, BRODY and SKILLMAN.
Ronald S. Fava, Passaic County Prosecutor, attorney for appellant State of New Jersey (Gary H. Schlyen, Chief Assistant Prosecutor, of counsel and on the brief).
Alfred A. Slocum, Public Defender, attorney for respondent J.L.W. (Robert L. Sloan, Assistant Deputy Public Defender, of counsel and on the letter brief).
The opinion of the court was delivered by BRODY, J.A.D.
On the basis of an adverse inference drawn from the State's failure to call a witness at a referral hearing, a Family Part judge determined that the evidence did not present probable cause to believe that the juvenile, J.L.W., had committed the offenses with which he has been charged. We granted the State leave to appeal and now hold that when determining probable cause a judge is limited to a consideration of the evidence presented, including its adequacy, and may not infer that the testimony of witnesses the State declined to produce would be adverse to its interests.
*340 The several juvenile complaints that initiated these proceedings are based on two unrelated episodes of criminal conduct that the State attributes to J.L.W. Both occurred on a New Year's weekend from Friday, December 30, 1988, to Monday, January 1, 1989.
The State presented evidence that on Friday, at about 2:00 a.m., J.L.W. fired a gun once into the air and then five times into a house. A short time earlier, he had been rebuffed by his former girlfriend, A.C., when he made an uninvited sexual advance. A.C. reported the incident to her new boyfriend who immediately sought out J.L.W. and challenged him to a fight. When J.L.W. declined, the new boyfriend taunted him by calling him a coward. The house into which J.L.W. allegedly shot his gun was the new boyfriend's home.
The other episode occurred on Monday at about 3:00 a.m. when J.L.W. allegedly broke into the home of Mr. and Mrs. Rudolph Moody, Sr., and fired two gunshots into a first floor bedroom in which they were sleeping. On Sunday morning, about 24 hours earlier, J.L.W. allegedly had fired a gun from a moving car at the Moodys' 18-year-old son Rudolph Moody, Jr., allegedly in the mistaken belief that he was selling drugs in J.L.W.'s territory. Rudolph, Jr. lived in an apartment in the basement of his parents' home.
The first episode produced juvenile complaints that charged J.L.W. with nine acts of juvenile delinquency which, if committed by an adult, would be a second-degree possession of a firearm for an unlawful purpose, contrary to N.J.S.A. 2C:39-4a,[1] and eight third-degree aggravated assaults, one upon each of the occupants of the new boyfriend's home, contrary to N.J.S.A. 2C:12-1b(2). The second episode produced juvenile *341 complaints that charged J.L.W. with third-degree aggravated assault for firing a gun at Rudolph, Jr. on Sunday, contrary to N.J.S.A. 2C:12-1b(2),[2] and first-degree attempted murder for burglarizing the Moodys' home on Monday night and firing a gun into their bedroom, contrary to N.J.S.A. 2C:11-3a(1).[3]
The State moved for waiver of the Family Part's jurisdiction over J.L.W. so that he could be tried as an adult on all charges. N.J.S.A. 2A:4A-26 and R. 5:22-2. The statute and the rule require the Family Part judge to determine, among other things, whether there is "probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult..." would constitute certain crimes. Those crimes include the crimes referred to in the juvenile complaints. Because of his determination that the State had not established probable cause as to any of the offenses, the trial judge did not consider the other criteria listed in the statute and the rule.
The judge found from the testimony of investigating police officers that the two episodes had occurred. One officer testified that when he arrived at the scene of the Friday morning shooting, one of the occupants of the house showed him bullet holes in the outer wall and in a window where the shots had entered. Another officer testified that when he arrived at the scene of the Monday morning shooting the Moodys told him that they were awakened, while in their bedroom, by the sound first of their front door and then of their bedroom door being kicked in just before the shots were fired. The officer found bullet fragments in a bedroom bureau and the marks of the sole *342 of a shoe on the doors. A neighbor claimed to have heard the shots.
The judge had difficulty, however, believing the uncontradicted evidence that J.L.W. had fired the shots. That evidence was in the form of an oral statement of Y.H., a 15-year-old girl, and the sworn written statements of Y.H. and Rudolph, Jr., taken in their mothers' presence.
The officer who responded to the scene of the Friday morning shooting at the house of A.C.'s new boyfriend testified that he interviewed Y.H. when he arrived there. She told him that she had seen J.L.W. pull up to the house in a "bluish green Cutlass" and fire "one shot in the air and five into the house." She told the officer that the shooting was the result of J.L.W.'s earlier argument with her girlfriend A.C. over the fact that A.C. had a new boyfriend. The police verified that a car fitting the description given by Y.H. was owned by J.L.W.'s mother. Y.H. gave more details of the incident in her sworn statement to the police:[4]
Q. Will you tell me what occurred on December 30, 1988 In which gunshots were fired.
A. It was about 2:00 AM in the morning and me and [A.C.] were on our way to her boyfriends house located on Park Ave. across from Eastside High School. I was sitting In the parking lot across the street from the house as I got out I saw [J.L.W.] pull In a Green/Gray Cutlass, [J.L.W.] was In the passengers seat and another boy was driving, I stopped and I saw [J.L.W.] point a gun out of the window and started shooting Into the first floor window, he must have shot about Five times, after that he pulled off and I ran Into the first floor porch and knocked on the door. [A.C.]'s Boyfriend opened the door and I heard his mother yelling all upset, I told her what I had seen.
Q. Is this the first time that you had seen [J.L.W.]?
A. No earlier me and my girlfriend [A.C.] were together and [J.L.W.] who used to go with [A.C.] began touching her on her body, she told him to quit or she would tell her boyfriend [naming him] what he was doing, [J.L.W.] said he didn't care and [A.C.] told [her new boyfriend] he came and wanted to fight [J.L.W.] but [J.L.W.] wouldn't fight and he left In the Cutlass, It was about a *343 half an hour later that he came to Park Ave. where [A.C.'s new boyfriend] lives and started shooting.
Q. Are you positive that [J.L.W.] was the person that did the shooting?
A. Yes.
* * * * * * * *
Q. How long have you known [J.L.W.]?
A. For at least Two years.
* * * * * * * *
Q. Did you see the license plate on the car?
A. No.
The officer who took Y.H.'s sworn written statement relating to the first episode also took Rudolph, Jr.'s sworn written statement relating to the second episode. Rudolph described the shooting in his parents' house and the events leading to it as follows:
Q. Tell me In your own words what occurred to you that caused you to be [here] at the Police Station [to give a statement].
A. It was about 2:AM on Saturday December 31, 1988 and I was walking on Straight Street as I approached Governor Street a saw [J.L.W.] who was In a Gray Monte Carlo, [another boy] was driving and [J.L.W.] was In the Passengers seat. [J.L.W.] pointed a gun at me and I turned and started running up Governor Street, as I was running I heard several shots being fired. As I approached Auburn Street the car came around the corner and I heard them shooting, I continued to run up Governor Street to Carroll Street and I cut through a parking lot and called my Mother and told her what had happened the reason I did It was If I was shot and killed by him my Mother would know who did It. After that I went to my girlfriend's house ... and spent the night there. At approx. 12:00 Noon I returned to my Mother house. On January 1, 1989 about 3:00 AM I was watching T.V. In my room which Is located In the basement, I heard a noise upstairs like a banging, I went upstairs to see what was going on, as I was half the way up the stairs I heard my Mother screaming and I heard Two shots. As I was on the first floor I saw [J.L.W.] leaving out of the front door, I saw that the front door was opened and the door to my Mothers bedroom was also opened, my Mother was still screaming and calling for my little sister who Is Four years old, I went onto the porch but I didn't see [J.L.W.] or anyone else. My Mother told me that someone had kicked In both of the doors and fired shots Into her apartment but she and the rest of the Family were not hit by the shots fired.
* * * * * * * *
Q. How long have you know [J.L.W.] ...?

*344 A. I've known him Three to Four years....
* * * * * * * *
Q.... [W]ill you tell me why [J.L.W.] would want to shoot at you?
A. In July of "88" I started hanging around on Carroll Street and Governor Street, [J.L.W.] sells Drugs In that area and he thought that I was coming Into his area selling drugs.
* * * * * * * *
Q. Is there anything else that you wish to tell me about this Incident that I may not have asked you?
A. I know that they have bought new guns and that he said that this time he knows where I live at he's going to come to the basement to get me.
On cross-examination, the officer who took the statement acknowledged that a month or so later Rudolph, Jr. and his mother came to police headquarters and advised him that they wanted to drop the charges against J.L.W. He described the conversation in his testimony as follows:
She just came into my office and asked me, they came into my office that they would like to drop charges at which time I asked them are these charges true that you gave me, is the statement true at which time Mr. Moody said that the statement that I gave you is true, I just don't want to pursue the matter anymore, and I said, well, if you gave me the truth and this person shot up your house and almost shot you mother and your father and your little brothers and sisters then I'm not going to drop this and nobody is going to drop this. So, you know, you have to go to Court and deal with this matter.
The State declined to accede to the trial judge's repeated requests to call as a witness at least one of the two young people who had identified J.L.W. and given a factual basis for his motives. The trial judge recognized that probable cause may be established on the basis of hearsay evidence. State in Interest of B.T., 145 N.J. Super. 268, 272-273 (App.Div. 1976), certif. den. 73 N.J. 49 (1977). However, he drew an adverse inference against the State for not calling either as a witness, and therefore denied the State's motion. He expressed his reasons as follows:
I believe this is the first time I've ever requested to have a witness brought into Court, but when I heard this testimony immediately there were two red flags that I felt about the testimony and number one, unusual circumstances of the testimony or the statements of the witnesses to the occurrence namely, a young woman in a parking lot at 2:00 in the morning observing this. Secondly, a young man being shot at and his home being shot at over a drug transaction. *345 And thirdly, the request of the young man ... to withdraw the charges. Under these circumstances, I began to think in terms of the Clawans [State v. Clawans, 38 N.J. 162 (1962)] decision. Namely, that their nonproduction had something to do with their credibility and that the inference could be drawn that if they were brought into Court they might say something different from what was in their statement to the Police.... Under these circumstances, I do not believe the State has met its burden with respect to probable cause and its request is denied. Under these circumstances, I don't have to get to the question of whether or not the juvenile can be rehabilitated within the juvenile system or the family court system because I have denied the application on the grounds of probable cause.
The judge arrived at his determination of no probable cause at least in part by drawing an adverse inference against the State pursuant to Clawans. However, the adverse inference referred to in Clawans is available in certain circumstances at a trial, but not at a probable cause hearing. The Clawans Court stated the principle as follows:
Generally, failure of a party to produce before a trial tribunal proof which, it appears, would serve to elucidate the facts in issue, raises a natural inference that the party so failing fears exposure of those facts would be unfavorable to him.... [State v. Clawans, 38 N.J. at 170; emphasis added.]
Clawans did not create the inference to which it refers; it simply recognized that a reasonable fact-finder at trial would generally expect a party to produce an available witness who could give significant unbiased testimony unless that party feared that the witness's testimony would be unfavorable.
Clawans makes it clear, however, that that general expectation is not reasonable in many circumstances:
... But such an inference cannot arise except upon certain conditions and the inference is always open to destruction by explanation of circumstances which make some other hypothesis a more natural one than the party's fear of exposure....
For an inference to be drawn from the nonproduction of a witness it must appear that the person was within the power of the party to produce and that his testimony would have been superior to that already utilized in respect to the fact to be proved....
For obvious reasons the inference is not proper if the witness is for some reason unavailable or is either a person who by his position would be likely to be so prejudiced against the party that the latter could not be expected to obtain the unbiased truth from him, or a person whose testimony would be cumulative, unimportant or inferior to what had been already utilized. [Id. at 170-171]
*346 Thus a judge may not instruct a jury that it may draw an adverse inference against a party unless it is reasonable for that "trial tribunal" to expect that the party would call the witness unless he feared that the witness's testimony would be unfavorable. See State v. McBride, 211 N.J. Super. 699, 703 (App.Div. 1986).
It is not reasonable for a tribunal other than a trial tribunal to have such an expectation. Fact issues are decided with finality at trial, and therefore a trial tribunal could fairly expect a party to produce at trial any witness who would be significantly helpful. The probable cause phase of a referral hearing does not have the finality of a trial. Had the judge ruled, without drawing an adverse inference, that the evidence presented simply fell short of establishing probable cause, the State could have renewed its motion for referral with additional evidence.
Even if Clawans had not expressly limited its holding to the nonproduction of a witness before a "trial tribunal," additional circumstances generally anticipated in Clawans make it unreasonable to draw an adverse inference here. The State explained to the trial judge that it chose not to call these young witnesses in order to minimize their exposure to the rigors of testifying. If the State had to produce the witnesses at every probable cause hearing in order to destroy the adverse inference, the witnesses would also have had to testify at the detention hearing that had been conducted before a different trial judge. That judge had determined, among other things, that there was probable cause pursuant to N.J.S.A. 2A:4A-34c and R. 5:21-3(b).[5] The witnesses also would have to testify before a grand jury after referral. The State's desire to shield victims and witnesses from the pressures of the criminal justice process is consistent with the Legislature's declaration that crime victims and witnesses are entitled to "have inconveniences *347 associated with participation in the criminal justice process minimized to the fullest extent possible; ..." N.J.S.A. 52:4B-36d.
Moreover, it is also fair to infer, as the State argues, that Rudolph, Jr. requested the police to "drop the charges" because he feared reprisal and not because the charges were false, the inference that the trial judge apparently drew. We recognize the difficulty prosecutors often face in allaying a victim's or a witness's fear of reprisal. No adverse inference should be drawn against the State when the prosecutor seeks to minimize the number of times a victim or a witness must screw up his courage to testify.
The State has destroyed any adverse inference that may fairly be drawn from its failure to call these witnesses by its "explanation of circumstances which make some other hypothesis a more natural one than the party's fear of exposure." State v. Clawans, 38 N.J. at 170-171.
Without the adverse inference, the evidence presented was adequate to establish probable cause. We have applied the general definition of probable cause, found in State v. De Simone, 60 N.J. 319, 322 (1972), when considering whether probable cause has been established in a referral hearing. State in Interest of A.J., 232 N.J. Super. 274, 286 (App.Div. 1989). In De Simone the court held:
As to probable cause, it must be remembered that the showing need not equal a prima facie case required to sustain a conviction. No more is demanded than a well-grounded suspicion or belief that an offense is taking place and the individual is party to it. [State v. De Simone, 60 N.J. at 322.]
The trial judge did not find that the substance of the sworn statements of Y.H. and Rudolph, Jr. failed to meet that standard. Rather, he expressed doubts as to the inherent credibility of the statements in view of the unusual facts they recount and Rudolph, Jr.'s request to "drop the charges." We do not share those doubts.
*348 We have already stated our disagreement with the inference the trial judge drew from Rudolph, Jr.'s request to "drop the charges" against J.L.W.
The judge also questioned the witnesses' credibility because the events they described were "unusual," including Y.H.'s presence at the scene at 2:00 a.m. to witness the Friday shootings. In his oral opinion, however, the judge stated:
I find credible the testimony of the Police Officers at what they indicated to us about their investigation is, in fact, true. Everything they said I believe happened. There were two or three shootings here.
Although the shootings were unusual, the judge accepted as a fact that at least two of the three unusual shootings had occurred. Thus the question is not whether the shootings were unusual, but whether J.L.W. fired the gun. It also may be unusual for Y.H. to have been at the scene of the shooting at 2:00 a.m., but by believing the police officers' testimony the judge accepted as a fact that Y.H. was at the scene when, as one of the officers testified, he interviewed her shortly after the shooting.
We also do not share the trial judge's skepticism that someone dealing in drugs would resort to deadly violence to protect his market. Finally, the fact that one of the two witnesses identified J.L.W. as the person who fired a gun into an occupied home on one occasion, and the other witness identified him as the person who fired a gun into an occupied home on another occasion mutually bolsters their credibility.
We express no opinion regarding the additional criteria that must be established before referral may be ordered. We note that the attempted murder of the Moodys is by statute a serious "Chart 1 Offense" listed in N.J.S.A. 2A:4A-26a(2)(a) and (g) and R. 5:22-2(b)(2)A. Therefore, the judge may not deny referral of that charge on the ground that it is not serious. R. 5:22-2(b)(3). State v. R.G.D., 108 N.J. 1, 11-12 (1987). We also note that if the charge of attempted murder is referred, the charge of aggravated assault of Rudolph, Jr. should also be referred in order to avoid fractionalization of the entire episode. *349 State In Interest of R.L.P., 159 N.J. Super. 267, 271-272 (App. Div. 1978).
Reversed and remanded for further proceedings.
NOTES
[1] The complaint describes the unlawful conduct as "did have in his possession a dangerous weapon to wit: a hand gun to use for unlawful purpose," but erroneously cites N.J.S.A. 2C:39-4d (third-degree possession of a weapon that is not a firearm) as the statutory violation.
[2] The complaint refers merely to N.J.S.A. 2C:12-1b.
[3] The complaint does not specify which subsection of the murder statute was allegedly violated. However, the reference must be to N.J.S.A. 2C:11-3a(1), an attempt to "purposely" cause death, because there cannot be an attempt to cause an unintended result. State v. Darby, 200 N.J. Super. 327, 331-332 (App.Div. 1984), certif. den. 101 N.J. 226 (1985). See State v. McAllister, 211 N.J. Super. 355, 362 (App.Div. 1986).
[4] Except as indicated, excerpts from the statements of Y.H. and Rudolph, Jr., quoted below, are verbatim including typographical errors.
[5] We have not been provided with a record of that proceeding.