247 N.J. Super. 403 (1991)
589 A.2d 637
STATE OF NEW JERSEY, IN THE INTEREST OF B.G., C.A., AND P.A., JUVENILES.
Superior Court of New Jersey, Appellate Division.
Argued February 19, 1991.
Decided April 19, 1991.
*405 Before Judges DREIER, ASHBEY and LANDAU.
Harvey Weissbard and Alan L. Zegas argued the cause for appellant/cross-respondent B.G. (Weissbard & Wiewiorka, attorneys; Harvey Weissbard and Alan L. Zegas, on the brief).
Thomas P. Ford, Jr. argued the cause for appellant/cross-respondent C.A. (Thomas P. Ford, Jr. on the brief).
Willard E. Byer, Jr. argued the cause for appellant/cross-respondent P.A. (Willard E. Byer, Jr. of counsel and on the brief).
Elizabeth Miller-Hall, Assistant Essex County Prosecutor, argued the cause for respondent/cross-appellant State of New *406 Jersey (Herbert H. Tate, Jr., Essex County Prosecutor, attorney; Elizabeth Miller-Hall, of counsel and on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
C.A., P.A., and B.G., charged with juvenile delinquency,[1] appeal on leave granted from a Family Part ruling under N.J.S.A. 2A:4A-26, which transferred jurisdiction over certain complaints against them to the adult courts. The State cross-appeals from the Family Part's decision finding no probable cause for the charges which asserted force or coercion and from the court's finding that B.G. was rehabilitated.
These complaints stem from a March 1, 1989 incident in which M.G., a juvenile girl of limited intellectual ability, was allegedly the victim of various sexual assaults by more than one young man, acting as part of a group of teenaged juveniles and adults.[2] The nature of the specific charges against respondents requires detailed exploration under the statute permitting involuntary transfer to the adult courts, as such transfer can only be made if the Family Part judge finds that:
(2) There is probable cause to believe that the juvenile committed a delinquent act or acts which if committed by an adult would constitute [aggravated sexual assault, sexual assault and conspiracy].
N.J.S.A. 2A:4A-26a.
The State alleged that on March 1, 1989, C.A. committed the following acts against M.G.:
1) Aggravated sexual assault by force or coercion contrary to N.J.S.A. 2C:14-2a(5)(a) (vaginal penetration);

*407 2) Aggravated sexual assault on a person whom he knew or should have known to be mentally defective contrary to N.J.S.A. 2C:14-2a(5)(b);
3) Aggravated sexual contact contrary to N.J.S.A. 2C:14-3a (victim masturbate respondent);
4) Aggravated sexual contact where he knew or should have known the victim to be mentally defective contrary to N.J.S.A. 2C:14-3a and N.J.S.A. 2C:14-2a(5)(b);
5) Conspiracy to commit aggravated sexual assault contrary to N.J.S.A. 2C:14-2a(5)(a) & (b) and N.J.S.A. 2C:5-2.
The juvenile delinquency complaint against B.G. alleged that on the same occasion he committed the following acts against M.G.:
1) Aggravated sexual assault using force or coercion contrary to N.J.S.A. 2C:14-2a(5)(a) (fellatio);
2) Aggravated sexual assault where he knew the victim to be mentally defective contrary to N.J.S.A. 2C:14-2a(5)(b);
3) Aggravated sexual contact contrary to N.J.S.A. 2C:14-3a (victim masturbate respondent);
4) Aggravated sexual contact where he knew or should have known the victim to be mentally defective contrary to N.J.S.A. 2C:14-3a and N.J.S.A. 2C:14-2a(5)(b);
5) Conspiracy to commit aggravated sexual assault contrary to N.J.S.A. 2C:5-2.
The juvenile delinquency complaint against P.A. alleged he committed the following acts against M.G.:
1) Aggravated sexual contact using force or coercion contrary to N.J.S.A. 2C:14-3a and N.J.S.A. 2C:14-2a(5)(a) (victim masturbate respondent);
2) Aggravated sexual contact where he knew or should have known the victim to be mentally defective contrary to N.J.S.A. 2C:14-3a and N.J.S.A. 2C:14-2a(5)(b);
3) Conspiracy to commit aggravated sexual assault contrary to N.J.S.A. 2C:5-2.
The sexual assault charges represent adult crimes under N.J.S.A. 2C:14-2a(5)(a) and (b) which provides in relevant part:
2C:14-2. Sexual Assault. a. An actor is guilty of aggravated sexual assault if he commits an act of sexual penetration with another person under any one of the following circumstances:
....
(5) The actor is aided or abetted by one or more other persons and either of the following circumstances exists:
(a) The actor uses physical force or coercion, or
(b) The victim is one whom the actor knew or should have known was ... mentally defective....
*408 Similar provisions are incorporated by reference into the adult crime of criminal sexual contact. N.J.S.A. 2C:14-3a.
N.J.S.A. 2C:14-2 refers back to N.J.S.A. 2C:14-1, for the following definition:
h. "Mentally defective" means that condition in which a person suffers from a mental disease or defect which renders that person temporarily or permanently incapable of understanding the nature of [her] conduct, including, but not limited to, being incapable of providing consent;
"`Physical force' [not defined in the statute] is force applied to the victim's body." State v. Queen, 221 N.J. Super. 601, 606, 535 A.2d 539 (App.Div.), certif. denied, 110 N.J. 506, 541 A.2d 1367 (1988). N.J.S.A. 2C:13-5a, incorporated by reference in N.J.S.A. 2C:14-1j, gives the following definition of "coercion."
A person is guilty of criminal coercion if, with purpose unlawfully to restrict another's freedom of action to engage or refrain from engaging in conduct, he threatens to:
....
(7) Perform any other act which would not in itself substantially benefit the actor but which is calculated to substantially harm another person with respect to [her] ... career ... reputation or personal relationships.
A "mentally defective" person is one who does not have sufficient relevant sexual understanding, "including, but not limited to being capable of providing a consent." N.J.S.A. 2C:14-1h. Under N.J.S.A. 2C:2-10a, a victim's consent may also be considered a defense to forceful sexual assault by negating the force element or by precluding the harm sought to be prevented by the statute. See State in the Interest of M.T.S., 247 N.J. Super. 254, 259, 588 A.2d 1282, 1284 (App.Div. 1991). N.J.S.A. 2C:2-10c provides, however, that a victim's "assent" is not "consent" if
(2) [i]t is given by a person who by reason of ... mental ... defect ... is manifestly unable or known by the actor to be unable to make a reasonable judgment as to the nature of the harmfulness of the conduct charged ...; or (3) [i]t is induced by force, duress or deception of a kind sought to be prevented by the law defining the offense.
While lack of consent and force may not be co-extensive terms, CANNEL, CRIMINAL CODE ANNOTATED, Comment N.J.S. 2C:14-5, sexual assault definitions are in pari materia. *409 State v. Martin, 235 N.J. Super. 47, 54, 561 A.2d 631 (App.Div.), certif. denied, 117 N.J. 669, 569 A.2d 1359 (1989).

A. PROBABLE CAUSE
We have detailed the elements of the crimes before examining the judge's finding that probable cause had not been established as to any of the offenses involving force or coercion, but that probable cause had been established to believe all of the crimes, including conspiracy, had been committed knowingly against a mentally defective person.
Probable cause is "a well-grounded suspicion or belief that an offense [has taken] place and the individual [was] party to it." State in the Interest of A.J., 232 N.J. Super. 274, 286, 556 A.2d 1283 (App.Div. 1989) (citing State v. DeSimone, 60 N.J. 319, 322, 288 A.2d 849 (1972)). While "the suspicion of guilt must be something more than a raw, unsupported suspicion, it may be something less than the proof needed to convict." A.J., 232 N.J. Super. at 286, 556 A.2d 1283. The probable cause phase of a waiver hearing is a preliminary proceeding. State in the Interest of J.L.W., 236 N.J. Super. 336, 346, 565 A.2d 1106 (App.Div. 1989). Probable cause may be established on the basis of hearsay evidence alone, because a probable cause hearing "does not have the finality of trial," id. at 344, 346, 565 A.2d 1106, and "need not be based solely on evidence admissible in the courtroom." A.J., 232 N.J. Super. at 286, 556 A.2d 1283. In such proceedings, the judge does not act as a trier of fact to determine guilt or innocence. State in the Interest of A.T., 245 N.J. Super. 224, 227-228, 584 A.2d 861 (App.Div. 1991).

1. FORCE OR COERCION
In support of the motion judge's ruling that there was no probable cause for a finding of force, respondents rely on State v. R.G.D., 108 N.J. 1, 15, 527 A.2d 834 (1987), the seminal case on the standard of review concerning Family Part decisions to waive jurisdiction to the adult court. There the Court *410 said that a reviewing court may only reverse the action of the trial court upon a finding that the action was not grounded in competent, reasonably credible evidence, that correct legal principles were not applied, or that the judgment shocks the judicial conscience.
That standard, however, did not primarily concern probable cause. In R.G.D. the Supreme Court found probable cause to have existed to believe that two juveniles acting together had been guilty of aggravated sexual assault by force or coercion, despite considerable contrary evidence. R.G.D., 108 N.J. at 16, 527 A.2d 834. Such contrary evidence included proof that the victim had voluntarily accompanied the boys to a not very secluded place within their school, and "once there and after sexual advances had been made, she not only remained but moved twice to get away from others [strangers] who came into the auditorium." State v. R.G.D., 208 N.J. Super. 385, 391, 506 A.2d 36 (App.Div. 1986), rev'd, 108 N.J. 1, 527 A.2d 834 (1987). We review the record in this case with R.G.D.'s instructions in mind, that probable cause requires far less than a prima facie case. R.G.D., 108 N.J. at 16, 527 A.2d 834. Moreover, because the probable cause evidence in the case was hearsay, we are free to reexamine it in its entirety.
M.G. was 17 years old at the time of the incident. She was classified as educably mentally retarded, with an overall I.Q. of 64, a verbal I.Q. of 70 and a performance I.Q. of 59.[3] She was a lifelong special education student. Medically, she was classified as neurologically impaired.
The State's only witnesses concerning probable cause were two detectives who testified to various statements. The first statement came from the school swimming teacher that on March 3, 1989, M.G. had told her that she had been to "a party and there were ten guys there" and "something happened." *411 The next day M.G. elaborated to the teacher, that "the boys asked me to suck their dicks," and that "it really hurt me because they stuck something really big up my butt and it hurt." At first M.G. could not remember what the "something" was called, but later called it a "drumstick." The statement went on:
Then they asked me how many fingers I could put up myself. I told them I don't do that. They said yes I do and wanted me to show them. I don't know what to do. They said they would not be my friends if I didn't. They said if I tell anyone I would have to leave ... like I had to leave my other school. I love [my school] and I don't want to leave.
The swimming teacher reported the incident to the school social worker, who gave another statement to the police. Separately, a vice-principal reported a story from a child-study meeting in which a student had been heard talking about what appeared to be the same incident.
At this point the police juvenile officer (one of the State's witnesses) was contacted. An extensive investigation ensued, beginning with a March 27, 1989 oral statement by M.G. to the police, which was memorialized in an April 7, 1989 written statement. The detective said that several statements had to be taken because M.G. was subject to many distractions and was difficult to speak to, becoming irritable over time, and backing off when it appeared she was getting someone in trouble.
In evidence were four written statements M.G. gave to the police, describing that she was approached by respondent juvenile C.A. and enticed into a basement because she liked respondent juvenile P.A. who was there. In the basement, she found a group of boys whom she knew for "at least six years," including respondents. M.G. said that she was in that basement for about an hour. M.G.'s April 7 statement reflects the following: M.G. said respondent juvenile B.G. asked her to "suck his dick." When she refused, "he forced me by grabbing the back of my head and forcing it down." K.S. (one of the adults) said, "let's play a joke [illegible] on her." He got a bat and broom, put a plastic bag and vaseline on each. C.A. *412 proceeded to insert the broomstick into M.G.'s vagina. "It was scary," then K.S. "put the bat up my vagina. It hurt." Others encouraged the conduct, yelling, "[p]ut it up further." M.G. said her clothes were removed, and that some of the boys who were there in the beginning left while the penetration was taking place. When M.G. left, she went to a friend's house. She was embarrassed and scared to tell her parents.
In a May 5, 1989 statement M.G. added the names of others to the list of boys present. She then said that, although she performed fellatio on B.G. and her head was pushed down, she also was asked to masturbate him, saying, "This I did. I wasn't forced. While I was performing oral sex on [B.G.], [C.A., K.S., P.A.] were saying how far can you go & if I swallowed cum [sic]." She said that C.A. inserted the broomstick before the bat, while he and K.S. both laughed, and "[K.S.] put the bat into my vagina, it was a regular size bat. He forced my legs open, saying how far could I go in." He was laughing. P.A., along with others, was just watching.
In a May 18, 1989 statement, M.G. said that before the fellatio, B.G. and C.A. asked her how many fingers she could insert into her vagina. She inserted five fingers while the boys cheered her on. When asked if she was forced to do this, her answer was "no." She also described other sexual activity which she said she was not forced into doing, which did not include the fellatio or the bat and broomstick penetration.
In her fourth and final August 3, 1989 statement to the police, there was the following language:
[M.G.], during the interview yesterday which took place in our office, you stated that there were additional acts forced done upon you March 1st 1989, at the ... house. Tell me about them.
M.G. (or someone) had crossed out the word, "forced" and inserted the word "done."[4] In this statement, M.G. said that after "they used the bat & broomstick," R.C. "put a stick up *413 my vagina. It hurt. I told him that it hurt but he didn't stop. He was asking me if it made me feel good. Everyone was laughing." No vaseline had been used on this occasion because M.G. was going to take the stick home and the boys did not want the stick to smell. "The stick hurt because it was up me further than the bat and broomstick." This was followed by several instances of M.G.'s masturbating the boys, including P.A., at their instigation, before M.G. was told to "keep this a secret, not to tell anybody," and to "hurry up & get out of here." She gave reasons for not mentioning R.C. before, primarily to protect the juvenile officer. She had not previously mentioned the P.A. masturbation because she liked him. M.G. said she had first mentioned these new events at lunch with the juvenile officer the preceding day.
In the course of the investigation the police took statements from others at M.G.'s school, ultimately concluding that there were originally no fewer than 13 young men in the basement. One statement was given by the student whose remarks right after the incident had been partially responsible for the investigation. There were statements made by other students, including many who claimed to have been present at the beginning, but who left the basement upon seeing M.G. in various forms of undress. The detective testified that the student informant told her that on the day after, "everyone was talking. [K.S.] said that they used a bat on her. [C.A.] said something but I don't remember what. Someone said they took a splinter off the bat because they didn't want to be mean. They were talking about the broomstick but I don't remember who said what." His full statement was a part of the record.
We need not, however, detail the extent of the evidence of probable cause that fellatio, masturbation and the insertion of the bat and broomstick occurred, and that the respondent juveniles were involved. The judge so found. At issue is the judge's finding that the State had failed to sustain its burden of providing probable cause to demonstrate the element of force or coercion.
*414 On that topic, respondents were permitted to proffer a transcript of conversations between M.G. and a "friend." There M.G. said at one point that the "blow job" given B.G. was "exciting." M.G. gave monosyllabic answers to certain questions upon which respondents relied heavily. Concerning the broomstick, the following was recorded:
[Q]. It didn't hurt? Did it hurt?
[A]. No.
[Q]. Did it feel like you were having sex?
[A]. Yea.
At other points M.G. was asked by her inquirer,
[Q]. Did you  did you do the broomstick at all yourself? ... "Like if I wanted to, could I do it? Like did they let you do it yourself?
To which M.G. replied,
[A]. You want to do that to yourself (inaudible)?[5]
At one point M.G.'s "friend" suggested that M.G. should just "tell the truth." To which M.G. replied, [A]. "I can't do that. I mean, all the years I knew these kids, I can't do it. I mean especially [C.A.]. I used to go, I used to go to the soccer league with him." Elsewhere, M.G. said that she had not lied about respondents, only about R.C.[6]
The judge rejected the State's request that he personally listen to the tapes in order to evaluate its experts' position that the answers M.G. gave were not spontaneous. While respondents' expert, Dr. Kern, said these tapes were relevant to the extent of M.G.'s understanding, he described the contents as "meaningless." He said they showed sexual naivete and responses *415 to leading questions to which M.G. would be susceptible because of her mental condition.
Respecting the allegation of forced fellatio, Dr. Kern testified that because M.G. did not resist and there was no fighting, although her head was pushed down, "in a sense, she allowed it to be pushed down." He then retracted that statement after having his recollection of M.G.'s first two statements refreshed. He conceded that M.G.'s statement that K.S. put a bat in her vagina, that "[h]e forced my legs open saying, `How far could I go in,'" indicated force. To redirect and leading questions, Dr. Kern said that counsel's statement was "correct," that his view that no force was used was "based on an overall evaluation."
The evidence concerning whether M.G. was forced was presented as the antithesis of the evidence that she was defective within the meaning of the statute. If she was vulnerable but not defective, and her vulnerability caused her to accept what was done to her, then she was not forced or coerced. Thus, respondents argued that the State's expert reports failed to prove that she was defective, but did prove that she was not forced. Accordingly, we examine these reports in some detail.
Dr. Susan Esquilin reported that M.G. told her of the fellatio, broomstick and bat insertions in a manner consistent with the statements given to police. M.G. told the doctor she did not want these things to happen, but felt that she was "supposed to do" them. B.G. said that if M.G. did not perform the fellatio, he would tell her mother, and she was afraid that her mother would be told. She also said that fellatio experiences in the past "didn't bother her." M.G. said the doctor would "probably think I'm sick to let them do that [insert a broom or bat]," but, "[w]hen it was going up me, it felt like a D ... dick ... penis." M.G. felt bound by a pledge of silence which she did not break until after she heard rumors that the boys must have been talking, but that although she did not want to get "anybody in trouble," she wanted to tell because she "felt it was important ... it's serious ... people don't just do that." M.G. said her *416 prior sexual experiences were different because she had never been faced with a group before and "no one ha[d] ever inserted any objects into her." The doctor reported that, "[i]t was the use of the baseball bat and the broomstick that made this incident particularly bad in [M.G.'s] eyes." M.G. told the doctor that following the incident it hurt when she urinated. The doctor noted that M.G. did not understand the meaning of the word "force" except as physical pressure.
Dr. Esquilin concluded that M.G. was a fairly highly-functioning retarded young adult, but "willing to do almost anything to gain some modicum of social acceptance," seeing her own sexuality as a means of pleasing others ...," and that "[s]he does not seem to have the concept that she should be able to choose what to do with her body sexually and should not be subject to the whims of `friends.'"
Dr. Gerald Meyerhoff reported that M.G. was in the mildly retarded range, and suffered from a defect which rendered her incapable of understanding the nature of her conduct. He described interviewing those who knew M.G., including a social worker who overheard M.G. shout, loudly, in the middle of the hall, at school, ... "why is everybody so upset about this, making such a big deal, it was fun." As a characteristic of M.G., he said, "she permits without fleeing, the intrusion of potentially dangerous foreign objects, even though she feels pain."
In a subsequent report, Meyerhoff said,
I have concluded that ... [M.G.] did know her body was being invaded and that she was engaging in sexual conduct. However, ... the special circumstances of 3/1/89 involved such insidious coercion that, owing to her diminished ability to be assertive or exercise the ordinary judgment expected of a nondefective person (who would refuse to comply and who would attempt to flee) [M.G.] was `unable' to resist. Moreover, as the sexual activity proceeded that day she must have become more and more bewildered. A nondefective person would have, finally, registered alarm, and displayed prudence, and left, or would have attempted to leave. But, [M.G.] did not ultimately `understand,' that day, that she could refuse to participate. [Emphasis added.]
*417 Dr. Alvin Friedland classified M.G. as "having a primary attention deficit disorder associated with moderate to severe mental retardation," "significant learning deficits," but driven by her concept of friendship, without regard to repercussions. Dr. Friedland gave a second report, noting that "it is to be understood that [M.G.] is aware that the boys manipulated and mistreated her to force her into sexual activity," but she also knew "that these acts were wrong." Her primary motivation was to be liked by the boys and a fear that she will be blamed if "they get what they deserve." He described M.G.'s later ambivalence in minimizing the events as, "she knew she was manipulated and abused and unconsciously repressed the trauma of the incident."[7]
In his written decision, the judge said that the only evidence concerning force or coercion was M.G.'s initial statement with respect to fellatio, a statement which had been repudiated. We disagree. The testimony was taken sporadically from December 11, 1989, to July 2, 1990, ending with that of Dr. Kern. As Dr. Kern noted, M.G. referred specifically to "force" in the use of the bat in her May 5 statement, notwithstanding expert opinion concerning her limited understanding of the meaning of the word. We do not find that reference to have been repudiated. Moreover, the record was uncontradicted concerning the insertion of foreign objects held by others, including one respondent. A factual issue was raised that these actions were "physical force ... applied to the victim's body." State v. Queen, 221 N.J. Super. at 606, 535 A.2d 539. The judge found, and we agree, that there was probable cause to find that the group acted in concert, which tied that force to all of these respondents.
We have earlier recited some relevant statutory definitions, including that of "coercion." M.G. said that there were threats *418 to tell her mother. She first said that there were threats that she might be removed from the school. Even in her taped conversations, she characterized the way in which she was persuaded to accompany the boys as being "conned." Other proof of coercion includes the number of youths in the basement; their use of M.G.'s known attraction to P.A. as enticement, and M.G.'s history of believing in the sanctity of secrets in relation to peer acceptance. Respondents' conduct demonstrably represented an express and implied threat that if she did not do as they wished, they would harm M.G.'s "career ... reputation or personal relationships."[8] Truth finding is not our function, nor was it that of the motion judge. Although there were conflicts in the record, we find there was enough of a showing concerning coercion respecting all of the charges, including the masturbation incident charged against P.A., to constitute probable cause. R.G.D., 108 N.J. at 15, 527 A.2d 834. Accordingly, we reverse the motion judge's contrary determination.

2. MENTAL CAPACITY
We have discussed some of the testimony concerning M.G.'s mental capacity in the section of this opinion concerning "coercion" and "force." We now review the remainder of the testimony concerning M.G.'s mental capacity. The judge found probable cause to believe that M.G. was mentally defective under N.J.S.A. 2C:14-2a(5)(b) and N.J.S.A. 2C:14-3, after reviewing the standards enunciated in State v. Olivio, 237 N.J. Super. 428, 568 A.2d 111 (App.Div. 1989), certif. granted, 122 N.J. 123, 584 A.2d 200 (1990).[9] There Judge Antell said that the Legislature had limited "mentally defective" persons to include only those "incapable of understanding the nature of their conduct, i.e., that they are engaged in sexual activity." *419 Id. 237 N.J. Super. at 430, 568 A.2d 111 (emphasis in original). Thus, to be "mentally defective," a complainant must be one who could not appreciate the inviolability of her person or understand that others could not, without her consent, invade her person for carnal gratification Id. at 430-431, 568 A.2d 111.
Asked to render an expert opinion on M.G.'s ability legally to consent to sexual conduct in light of Olivio, Dr. Esquilin reported that M.G. "did and does understand the immediate acts of sexual congress," but "did not truly, operationally understand that she had a right to refuse to participate." In this opinion, Dr. Esquilin also referred to coercion in the events recounted by M.G.
Dr. Friedland was also called upon to render an evaluation of M.G.'s ability to consent to sexual activity in light of Olivio. It was his conclusion that at the time of the incident, M.G. had a significant mental deficiency, was "mentally deficient" and "did not have the capacity to say no because she was "mentally defective," causing her to have poor judgment and making her susceptible to manipulation and control by others.
Despite the provisions of R. 3:4-3, that a probable cause hearing consists of evidence offered by the State, subject to cross-examination, see A.T., 245 N.J. Super. at 227 n. 1, 584 A.2d 861, the defense was permitted to proffer Dr. Kern, who had examined the State's expert reports and M.G.'s statements. He testified that M.G.'s I.Q. was close to the normal range of 70 and, coupled with her relatively high functioning level and ability to understand social behavior and form concepts, M.G. had the ability to consent to sexual acts and to make a determination as to whether sexual acts are right or wrong.[10] Dr. Kern gave M.G.'s mental age to be "about 8 or 9." He agreed with the State's experts that "[M.G.] to some degree ... sees the world through the eyes of a young child who wishes to *420 please and maintain the affection of those around [her]." He also said that M.G.'s mental condition would make her more compliant and likely to do what was asked of her. He testified that "I think that they [the boys]  they knew that she was different; that she was strange. I think that they must have known that she had a lower intelligence than the average." (This opinion accorded with other statements in the record.) In his view, because M.G. refused to return to the basement the following day (to be videotaped) and showed reticence with adults but openly discussed sex when questioned by her peer, she was not defective in the Olivio sense.
Respondents point to the similarities between M.G. and the victim in Olivio, who was sixteen years old and classified as "educable mentally retarded." Id. at 431, 568 A.2d 111. The Olivio complainant attended special education classes at a high school, and had an I.Q. in the 60-65 range. Id. at 432, 568 A.2d 111. They suggest that the description of the complainant in Olivio could be equally applied to M.G., that is "[w]hat emerges, certainly, is the picture of a slow-thinking, poorly-functioning individual, but not one without the capacity to understand that she had the right to refuse defendant her favors and that defendant was using her to gratify his own sexual desires." Id.
Respondents also urge that, while the State's psychological reports concluded that under Olivio, M.G. would be considered mentally defective, these conclusions are inconsistent with many of the facts adduced, as well as with statements by M.G. concerning her sexual conduct. The judge found otherwise, and we agree.[11]
*421 We first distinguish Olivio for many of the reasons that we have previously distinguished a probable cause determination from proceedings which require the establishment of a prima facie case. The State properly relied entirely on expert reports to establish its probable cause, as it had a right to do, whereas Olivio followed an appeal from a trial in which a jury had determined that one incident of vaginal intercourse was not the result of force or coercion.
Moreover, unlike the circumstances described in Olivio, the evidence presented in this case suggested that, even acknowledging M.G.'s general similarity to the Olivio complainant, probable cause could have been derived from Dr. Meyerhoff's report concerning M.G.'s becoming "temporarily" mentally defective in the sexual sense. Dr. Meyerhoff noted the combined and cumulative effect of M.G.'s underlying disability and the progressive sexual requests from seven to thirteen young men after she was enticed into a small space and there surrounded. He characterized these special circumstances as insidious coercion which made her "ultimately" unable to resist. Dr. Kern admitted that he did not remember whether he had considered such a temporary condition when he rendered his opinion, although he later said M.G.'s "mental state ... was that way before the incident, during the incident ... [and] the same [today]." Assuming a factual issue on temporary mental defectiveness, the State had no obligation to present its full evidence concerning M.G.'s deficits, nor to prevail in the dispute. The judge's finding of probable cause to believe that M.G. was mentally defective and that respondents knew or should have known of her vulnerability is amply supported in the record.

3. RESPONDENTS' REMAINING PROBABLE CAUSE POINTS
The nature of the proceeding also disposes of respondents' claim that they were denied a variety of constitutional *422 rights[12] by virtue of the trial court's (1) refusal to issue an order to release grand jury testimony; (2) refusal to allow respondents the opportunity to examine M.G.; (3) refusal to grant an order allowing defense attorneys to speak with Dr. Friedland; (4) decision to admit Bruton[13] testimony; (5) decision to allow testimony from a lay witness regarding how M.G. would be perceived by respondents; and (6) decision to exclude testimony vis-a-vis M.G.'s sexual history. While waiver hearings are "critically important," they require only the "procedural regularity sufficient in the particular circumstances to satisfy the basic requirements of due process and fairness." R.G.D., 108 N.J. at 4, 5, 527 A.2d 834.
[C]onstitutional guarantees arising from the question of admissibility of evidence at a trial on the merits do not apply to a preliminary jurisdictional hearing which simply determines whether the accused is to be tried in one court or another. Such a hearing is a preliminary proceeding to determine the propriety of transfer under the statutory criteria. The portion of the hearing relating to probable cause can be analogized to the probable cause hearing prior to indictment or the determination of a grand jury to indict. In either of these instances, rules of evidence and constitutional guarantees involving the trial process are inappropriate. Since the result of a preliminary judicial proceeding as involved herein does not adjudicate the guilt of the accused, the type of permissible evidential material used by the court in reaching its conclusion is not circumscribed by the limited evidential rules applied at trial.
....
The demands of due process at such a preliminary stage of the proceedings are no more extensive than to afford the accused a fair hearing where he is represented by counsel and has an opportunity to be heard and present evidence. Such rights are guaranteed in this State with respect to a transfer hearing. Otherwise, the full panoply of [Constitutional] rules and rights guaranteed to defendants ... have no relevancy or application.
State in the Interest of B.T., 145 N.J. Super. 268, 273, 367 A.2d 887 (App.Div. 1976), certif. denied, 73 N.J. 49, 372 A.2d 314 (1977), (citations omitted), cited with approval in R.G.D., 108 N.J. at 16, 527 A.2d 834.
*423 We find no denial of due process in the extended record and the twenty volumes of transcript. Respondents were permitted to proffer their own evidence on probable cause. But see A.T., 245 N.J. Super. at 227 n. 1, 584 A.2d 861 and R.G.D., 108 N.J. at 16, 527 A.2d 834 (appearing to limit juvenile respondent's probable cause evidence to that related to rehabilitation). Respondents' due process arguments are meritless.
Clearly also, there is no violation of the principles of double jeopardy in our finding that probable cause was established concerning the charges of force and coercion, given the preliminary nature of these proceedings. See J.L.W., 236 N.J. Super. at 346, 565 A.2d 1106 (upon judge's ruling that the State's probable cause evidence is insufficient, State may renew motion for waiver with additional evidence).

B. REHABILITATION
Upon a finding of probable cause, the court was obliged to make a determination as to whether respondents had been (or could have been with respect to C.A.) rehabilitated by their nineteenth birthdays. N.J.S.A. 2A:4A-26a(3). It was respondents' burden to make the showing, and even if that burden was carried, it was proper for the court to decide whether society's interest in deterrence for its own protection outweighed the juveniles' rights. State in the Interest of C.A.H. & B.A.R., 89 N.J. 326, 338-339, 446 A.2d 93 (1982). After expert psychiatric testimony, the judge issued a second written opinion. We summarize that holding:
1) In light of the fact that C.A. had received no therapeutic intervention, and that he was unlikely to receive sufficient therapy in the six months remaining before his nineteenth birthday, he had not been rehabilitated.
2) P.A., having been two weeks short of his eighteenth birthday at the time of the incident and beyond nineteen at the time of the rehabilitation hearing, had not been rehabilitated.
3) B.G., having had some therapeutic intervention, and having shown signs of remorse, had been rehabilitated. However, since the law also contemplates the need to weigh rehabilitation against the reasons for waiver (i.e., deterrence), and since B.G. was a central figure in a serious offense committed two months short of his eighteenth birthday, public interest demanded waiver.
*424 We are satisfied that the judge's rulings concerning the absence of probable timely rehabilitation of P.A. and C.A. was supported by credible evidence. The court's further determination, that the probability of rehabilitation for B.G. did not substantially outweigh the reasons for waiver, was within the appropriate exercise of the judge's discretion, which was informed by relevant standards. See R.G.D., 108 N.J. at 11, 527 A.2d 834; C.A.H. & B.A.R., 89 N.J. at 333, 446 A.2d 93; A.J., 232 N.J. Super. at 284, 556 A.2d 1283.
The order appealed from is reversed in so far as it denied the State's motion to transfer to the adult courts those charges involving force and coercion and is otherwise affirmed.
DREIER, J.A.D. (Concurring).
I concur with the majority opinion, but must explain my concurrence insofar as it relates to the single issue of M.G.'s status as a mentally defective person, discussed by Judge Ashbey in section A2 of her opinion. Were this an assault case involving a lone actor, even if there had been a claim that the actor was aided or abetted by another, I would subscribe to Judge Antell's analysis of mental defect in State v. Olivio, 237 N.J. Super. 428, 568 A.2d 111 (App.Div. 1989), certif. granted, 122 N.J. 123, 584 A.2d 200 (1990). In such a less-stressful situation, and applying the Olivio standard, the alleged victim most probably could not have been deemed mentally defective under N.J.S.A. 2C:14-2a(5)(b) or N.J.S.A. 2C:14-3a. For all of the reasons stated in Olivio, contrary finding would cause virtually all sexual activity with a mildly retarded individual to be considered criminal in the eyes of the law. I cannot read either the current statute or the New Jersey Criminal Law Revision Commission Report and Commentary upon which our present Code of Criminal Justice was largely based, as intending such a result.
Here, however, testimony concerning the group sex and situational confusion it allegedly engendered in M.G. at least *425 provided probable cause for a finding that she was "mentally defective" at the time of the occurrence under review. The statutory definition of "mentally defective" in N.J.S.A. 2C:14-1h notes that the defect is sufficient if it renders the victim "temporarily or permanently incapable of understanding the nature of [her] conduct...." By the use of the term "temporarily," the Legislature can be said to have recognized not only a defective state caused by a temporary physical or mental defect (such as an operable brain lesion or a severe temporary depression), but also a situational inability of the victim to cope with a sexual situation. This reason is in accord with Dr. Meyerhoff's opinion, explained in the majority opinion, supra, 247 N.J. Super. at 421, 589 A.2d at 646. Since the focus is upon M.G.'s ability to understand the nature of her conduct, I by no means would find that the court's conclusions were mandated by the evidence, but only that probable cause was a permissible finding.
With this brief explanation, I concur with the balance of the majority opinion in its reversal in part on the issue of force and coercion, and affirmance in part on the issue of sexual relations with a mentally defective person.
NOTES
[1] At the time of the hearing, both P.A. and B.G. were nineteen years old. C.A. was six months short of his nineteenth birthday. So long as subject to the jurisdiction of the Family Part, no juvenile is a criminal defendant; accordingly they are all here referred to as respondents.
[2] Five adult defendants currently face criminal charges in the adult courts following a May 21, 1990 grand jury indictment concerning the same incident. Given the nature of the proceedings, we have used initials for them.
[3] The school record showed that two years previously it had been determined that her I.Q. was 49.
[4] The State contends this change was made by the interviewer and initialed by M.G.
[5] Dr. Stanley Kern, respondents' psychiatrist, testified that this demonstrated that M.G. acknowledged that it was unbelievable that someone would do such a thing to herself.
[6] These tapes were reviewed by the State psychiatrists, but none changed their opinions, all reasoning that the questions necessarily led to answers which M.G. thought her friend wanted to hear. Dr. Kern in part disagreed, contending the discussion showed she could tell her friend about sexual incidents, but would hide the conversation from parental figures, indicating her ability to understand and refuse the activity.
[7] The judge rejected the State's proffer of one expert report from a nurse, assertedly directed toward providing an explanation concerning M.G.'s conflicting statements about force.
[8] See N.J.S.A. 2C:13-5a(7).
[9] We derive the caption in this case from the Supreme Court citation.
[10] Dr. Kern later testified that he had not intended his opinion to be interpreted to have meant that M.G. was "just a few points below being normal."
[11] Respondents' reliance on State v. Johnson, 155 Ariz. 23, 745 P.2d 81 (1987) and Stephenson v. State, 35 Ala.App. 379, 48 So.2d 255, cert. denied, 254 Ala. 313, 48 So.2d 259 (1950), is misplaced. Like Olivio, all of these cases involve one actor, one complainant and sexual intercourse. We do not consider them apposite.
[12] Right to counsel, right to confrontation, right to due process. U.S. Const. amends. V, VI, XIV.
[13] 391 U.S. 123, 135-137, 88 S.Ct. 1620, 1627-1629, 20 L.Ed.2d 476, 485-486 (1968).